The STATE of Ohio, Appellee,

v.

KNIGHT, Appellant.

[Cite as *State v. Knight* (2000), 140 Ohio App.3d 797.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990425.

Decided Sept. 22, 2000.

798

800

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.,* Assistant Prosecuting Attorney, for appellee.

*H. Fred Hoefle,* for appellant.

---

WINKLER, Judge.

Patrick Knight was charged with six counts of bribery and four counts of sexual battery as a result of acts committed while he was a Cincinnati police officer. After a bench trial, Knight was convicted of two counts of bribery and one count of sexual battery. Knight appeals his convictions. We affirm the judgment of the trial court.

In seven assignments of error, Knight challenges (1) the sufficiency of the evidence used to convict him, (2) the weight of the evidence, (3) the trial court's denial of his Crim.R. 29 motion for a judgment of acquittal, (4) the trial court's vacation of its order for separate trials and prohibiting the use of other acts evidence, (5) the court's coercing him into waiving his right to a jury trial, (6) the court's refusal to admit an out-of-court statement, (7) the state's discovery violation, and (8) the court's denial of his motion to dismiss the bribery counts.

We consider the first three assignments of error together. In reviewing a sufficiency-of-the-evidence claim, an appellate court must examine the evidence presented at trial and determine whether the evidence, viewed in a light most favorable to the state, could have convinced any rational trier of fact that the defendant was guilty beyond a reasonable doubt. See *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. When reviewing a challenge to the trial court's denial of a Crim.R. 29 motion, an appellate court is required to determine whether the evidence "[was] such that reasonable minds [could have] reach[ed] different conclusions" as to whether the state had proved each material element of the offense beyond a reasonable doubt. See *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus. On the other hand, when reviewing a weight-of-the-evidence question, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. See *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 218–219, 485 N.E.2d 717, 720.

Knight claims that the evidence adduced at trial was insufficient to support his conviction for bribery regarding victim Patricia Hill. The evidence demonstrated that on July 31, 1995, Knight made a traffic stop of a van in which Hill was a passenger. Knight arrested the driver on an open warrant. Hill told Knight that she had no way to get home and no money, and she asked Knight if she could drive the van home. Knight refused, telling Hill that her driver's license had expired. Knight offered to drive Hill home after he had requested that fellow police officers Paul Fangman and James Kelleher transport the arrested driver to jail. Knight instructed Hill to sit on a bench at an intersection about a block away to wait for him.

Hill waited on the bench for ten to fifteen minutes. Then Knight picked her up and drove her through a rough, dark, and deserted area. When Hill told Knight that she appreciated the ride home, Knight told her that she could show her appreciation by providing sexual favors. When Hill refused, Knight ordered her to get out of the police cruiser, saying that he did not want to waste any time on her. Hill walked down the street, found a telephone booth, and called 911 to

report the incident. As Hill spoke to the 911 operator, Knight frightened her by driving past her a number of times.

Retired Cincinnati Police Officer Jerome Johnson testified that he was the police sergeant dispatched in response to Hill's 911 call. When Johnson arrived at Hill's location, Hill told him about her encounter with the officer. At the time, Hill did not know Knight's name. Johnson told her that if she were lying, she could be charged with filing a false report. Hill told him that she would not be intimidated. Fangman testified that he and Kelleher had transported Hill home, on Johnson's order. Hill also told Fangman and Kelleher that another officer (Knight) had offered her a ride home in exchange for sexual favors, and that, when she refused, the officer left her.

Police records corroborated many details of Hill's testimony. The mobile-data-terminal ("MDT") records from Knight's cruiser reflected his inquiries about the status of Hill's driver's license and the warrant on the driver of the van. The MDT records also showed that Knight completed his interaction with the driver at 4:23 a.m. The MDT records from Fangman's cruiser confirmed that Fangman and Kelleher transported the driver from the arrest scene at 4:23 a.m. Police records indicated that Hill called 911 from the telephone booth at 4:35 a.m. The recording of the 911 call corroborated Hill's description of the incident with Knight. Hill told the operator that a police officer had pulled over her friend and that the officer had offered her a ride home. Hill said that, after the officer told her to get out of his car when she refused to give him sexual favors, "he said, 'Well I don't care, because I'm not going out of my way. I'm supposed to be off at five.'" Hill told the operator numerous times that the officer was driving past her and that she was scared. Hill also said that she did not want the operator to dispatch any officers over the radio because the officer would hear the dispatch. Knight's daily activity records indicated that his shift ended that day at 5:00 a.m.

R.C. 2921.02(B) provides as follows:

"No person, either before or after he is elected, appointed, qualified, employed, summoned, or sworn as a public servant or party official, shall knowingly solicit or accept for himself or another person any valuable thing or valuable benefit to corrupt or improperly influence him or another public servant or party official with respect to the discharge of his or the other public servant's or party official's duty."

██ Soliciting improper sexual relations may be construed as a valuable thing. See *Scott v. State* (1923), 107 Ohio St. 475, 485, 141 N.E. 19, 22. The evidence demonstrates that Knight solicited sexual relations from Hill "to corrupt or improperly influence him" with respect to his duty as a police officer. Knight

claims that the state failed to prove the "duty" element of the bribery charge, in that he had no duty to drive Hill home. We disagree.

■■ A police officer's duties as a public servant arise from statutes, rules, and regulations. See *State v. Duvall* (June 6, 1997), Portage App. No. 95-P-0140, unreported, 1997 WL 360695. R.C. 737.11 provides that the general duties of a city's police force are to "preserve the peace, protect persons and property, and obey and enforce all ordinances [laws, and court orders]." A police officer's duty for purposes of a prosecution for bribery may also arise from usage or custom. See *State v. Italiano* (1985), 18 Ohio St.3d 38, 40, 18 OBR 75, 77, 479 N.E.2d 857, 860, citing *United States v. Birdsall* (1914), 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930, and *Kable v. State* (1973), 17 Md.App. 16, 299 A.2d 493 (noting that a police officer's duty to confer with the prosecutor regarding reduction of criminal charges arose by custom or usage).

Cincinnati Police Lieutenant Art Frey testified that a police officer might face situations in which a stranded person required transportation. For example, the person's car might be broken down, it might be late at night, or the person might have no other means of transportation. In step with R.C. 737.11's duty to protect persons, the Cincinnati Police Division had in place a procedure for an officer's provision of transportation to a stranded person, whether to the person's home, a police district, or another safe location where the person could make a telephone call. The transporting officer was required to give a "Signal 39" to the dispatcher, along with the mileage driven and the time the officer discharged the passenger. Once an officer determined that he would drive a person home, the officer assumed the duty to provide transportation, according to Cincinnati Police protocol.

Officers Johnson and Fangman reiterated their own adherence to proper protocol regarding Hill. The following colloquy took place between the prosecutor and Johnson on cross-examination:

"Q. * * * [I]f Fangman and Kelleher had not been available, would you have just left [Hill] there?

"A. No, ma'am.

"Q. What would you have done?

"A. I'd either assigned [*sic*] someone else to take her home, or I would have taken her home.

"Q. Had she not made any allegations whatsoever against a police officer, would you leave a woman in that area alone at 5:00 in the morning with no way home?

"A. No, ma'am."

Fangman testified that, before Johnson ordered him to drive Hill home, he told Hill that he and Kelleher could not drive her "all that way home, [but] that we would take her to a place inside our beat or near our beat where she would be safe and call for a ride."

To determine whether Knight was engaged in an official duty, we must look at the activities in which he was engaged at the time. See *Duvall, supra.* In this case, Knight instructed Hill to wait for him on a bench a block away, in the dark early morning hours, in a "pretty rough area" near "the projects." Knight had not only offered Hill a ride home, as would comport with Cincinnati Police procedure for a stranded person, but he also began to take her there before abandoning her. Knight's offer and provision of transportation to Hill "must be considered a responsibility implicitly authorized by custom and circumstance, amounting to an official practice and, consequently, one of [the officer's] 'official duties[.]'" See *Kable, supra,* 17 Md.App. at 22–23, 299 A.2d at 497 (holding that a police officer's authority and duty to request dismissal of traffic violations arose by custom).

■ We hold that Knight's convictions for bribery and sexual battery in relation to victim Lynne Curtis were also based upon sufficient evidence. On October 19, 1995, Knight stopped Curtis as she was driving with her friend Jerome Nored in his car. When Curtis failed to produce her driver's license, Knight placed Curtis in his police vehicle, which looked like "a Bronco truck." Knight determined that Curtis was wanted on an open capias. Knight spoke to Nored, who walked away from the scene.

Knight told Curtis that he would have to take her to jail. Curtis asked Knight to write her a citation rather than to take her to jail because she was on probation. Knight asked Curtis, "What can we do to keep you from going to jail?" Curtis asked him what he meant. Then Knight said, "Well, I mean, you're on the same page I'm on." Curtis again asked Knight to give her a ticket and told him that she would go to court.

Knight drove Curtis to an isolated and dark parking lot behind a school. He went around to the passenger side of the vehicle, opened the door, and put a flashlight in Curtis's hand. Knight turned her toward him, opened her legs, and directed that Curtis shine the flashlight on herself. Knight pulled his penis out of his pants, pulled Curtis toward him, and then turned her around so that her head was still in the vehicle. Curtis heard Knight put on a condom just before he penetrated her.

Police records showed that a dispatcher asked Knight if he was going to cite Curtis or arrest her. Twenty minutes later, Knight responded that he would

merely cite Curtis. Knight wrote Curtis a ticket for driving without a license and did not arrest her. Then Knight dropped Curtis off in front of another school.

Cincinnati Police Officer Terry Smith testified that he had contact with Curtis in March 1996, after her arrest for some theft offenses. After admitting her involvement in the offenses, Curtis began to cry. When Smith asked her what was wrong, Curtis told him that she could not trust the police because of something an officer had done to her. Curtis relayed to Smith the details of her encounter with Knight, which were consistent with Curtis's testimony at trial.

Knight's solicitation of sexual favors from Curtis to improperly influence him with respect to his duty to arrest or cite her constituted the offense of bribery. Furthermore, the evidence supported his conviction for sexual battery. R.C. 2907.03(A)(1) provides:

"No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender knowingly coerces [her] to submit by any means that would prevent resistance by a person of ordinary resolution."

Knight submits that the state failed to present any evidence of coercion, let alone coercion of a type that would have prevented resistance by a person of ordinary resolution. We are not persuaded. Curtis was molested by a uniformed police officer at the side of a police vehicle in a dark and isolated area. She testified, "I kind of figured I was getting ready to lose my life. * * * Because I have never been that close to a police officer and, you know, as he was trying to hold me * * * [a]nd he had a gun and, you know[.]" Curtis was frightened and Knight played on her fear of going to jail. We cannot say that Curtis was not a person of ordinary resolution.

Knight claims that the state failed to prove that Curtis was not his spouse. We disagree. Sufficient circumstantial evidence existed to establish that Knight was not Curtis's spouse. From our review of the record, we hold that there was substantial evidence from which the trial court, sitting as the factfinder, could have concluded that each and every element of sexual battery had been proven beyond a reasonable doubt. See *State v. Wiggins* (July 1, 1992), Hamilton App. No. C–910620, unreported, 1992 WL 156122; *State v. Patton* (Apr. 8, 1992), Hamilton App. No. C–910479, unreported, 1992 WL 74197; *State v. Boeddeker* (Nov. 29, 1995), Hamilton App. No. C–950137, unreported, 1995 WL 699874.

While the state's last witness was on the stand, the trial court informed counsel that it planned to ask the witness about the administration of polygraph tests for each of the four victims. Both the state and the defense objected to the admission of the polygraph evidence. The matter was resolved when both sides and the court stipulated that polygraph tests were administered to the four victims and that no inference would be drawn from the results of the tests.

Knight now claims that the court's inquiry into the administration of the polygraph tests demonstrates that the court had sufficient doubt as to the credibility of the four victims. We find no merit to this claim.

■ The Ohio Supreme Court has held that polygraph evidence is inadmissible in a criminal trial unless both the state and the defense agree to its admissibility. See *State v. Souel* (1978), 53 Ohio St.2d 123, 7 O.O.3d 207, 372 N.E.2d 1318. The record makes clear that the trial court's interest in the polygraph evidence stemmed not from its doubt about the witnesses' credibility, but from its philosophical belief that Ohio law on the issue of polygraph evidence was "not in step with the current interpretation of Evidence Rule 702 concerning expert testimony," and that the issue should be tested.

■ Knight claims that his conviction was contrary to the manifest weight of the evidence because the testimony of the prosecution's witnesses was unbelievable. It is well settled that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. See *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. The trial court noted regarding the offenses involving Curtis "that the evidence, in some 'of its details, is conflicting. However, the core of the evidence remains believable and persuasive." Based upon the evidence of record, we hold that the trial court did not lose its way or create a manifest miscarriage of justice by concluding that Knight was guilty of the counts involving Hill and Curtis.

We hold that the evidence presented by the state was sufficient as a matter of law, that the weight of the evidence supported the guilty findings, and that the trial court correctly overruled Knight's motion for acquittal pursuant to Crim.R. 29. Therefore, we overrule the first, second, and third assignments of error.

■ The trial court initially granted Knight's motion to sever the counts for trial, so that there would have been four separate trials, with each trial limited to the allegations of a single victim. When the state elected to proceed in the first trial on six counts involving one of the victims, it filed notice of its intent to introduce evidence of the acts involving the three other victims. Knight filed a motion to exclude the other acts evidence involving the three other victims. The trial court granted the motion, and the state filed an interlocutory appeal to this court. We reversed the trial court's decision, holding that it was erroneous and an abuse of discretion. See *State v. Knight* (1998), 131 Ohio App.3d 349, 722 N.E.2d 568, discretionary appeal not allowed, (1998) 83 Ohio St.3d 1432, 699 N.E.2d 947. On remand, the state moved to vacate the severance order. Knight did not object, and the trial court granted the motion.

In his fourth assignment of error, Knight claims that the vacation of the severance order violated his right to due process of law. In his fifth assignment

of error, Knight argues that, by vacating the severance order, the trial court "coerc[ed] him into waiving his constitutional right to trial by jury." We reject both of these claims.

As the state correctly points out, Knight cannot demonstrate that he was prejudiced by the joinder of offenses. Any claims of prejudice are easily negated (1) by the "other acts" test, whereby the state could introduce evidence of one crime in the trial of another crime, pursuant to Evid.R. 404(B), and (2) by the "joinder" test, whereby the evidence of each crime joined at trial was simple and direct. See *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293, 298. Knight acknowledges that this court has already ruled on the "other acts" issue in this case, but urges us to reconsider our previous ruling. We decline the invitation. Furthermore, under the simpler "joinder" test, it is doubtful that the trial court "would [have been] confused by the offenses or would [have] improperly cumulate[d] evidence of the various crimes." *Id.*, 51 Ohio St.3d at 164, 555 N.E.2d at 298. Knight has not demonstrated that the trial court abused its discretion in vacating the severance order. See *State v. Torres* (1981), 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288, syllabus.

■ Moreover, the plain error rule applies where Knight failed to object to the court's vacation of its severance order. Knight's trial counsel made the tactical decision to proceed, without objection, with a single trial on all charges. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. Our review of the record reveals neither reversible error nor a manifest miscarriage of justice. See *Lott, supra*, 51 Ohio St.3d at 164, 555 N.E.2d at 299.

■ We are not persuaded by Knight's claim that the vacation of the severance order coerced him to waive his right to a trial by jury. In fact, Knight has acknowledged in his brief to this court that he "waived a jury by his own consent." He attempts to claim, though, that the consent was not truly voluntary because of "the erroneous decision of the trial court in complying with [t]his court's mandate." Not only did Knight acknowledge to the trial court that he voluntarily waived his right to a jury trial, but his highly experienced trial counsel agreed, telling the court, "We had several discussions on this issue, and I'm totally satisfied that this is a knowing, intelligent and voluntary waiver." Finding no merit in the fourth or fifth assignments of error, we overrule them.

■ In his sixth assignment of error, Knight argues that the trial court erred by excluding from evidence a statement made by Patricia Hill's companion to Cincinnati Police Officer Paul Fangman. Fangman had transported Hill's com-

panion, Jerry Woodard, to jail after Woodard's arrest by Knight. On the witness stand, Patricia Hill denied that she had agreed to provide Woodard sexual favors in exchange for a ride home. In its case, the defense called Fangman on direct examination. The defense asked Fangman whether Woodard had mentioned that he had been transporting Hill in exchange for sexual favors. The trial court sustained the state's objection to the question, on the ground that it was inadmissible hearsay. Knight proffered the testimony of Fangman, *i.e.*, that Woodard told him that Hill had agreed to have sex with Woodard in exchange for a ride home.

Knight has failed to demonstrate that any substantial right was affected by the exclusion of Woodard's statement to Fangman. See Evid.R. 103(A); *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147, syllabus. It was clear from the context of the question what Knight's proffer would have been. Moreover, even if the excluded statement had been admitted, the remaining evidence, standing alone, comprised overwhelming evidence of Knight's guilt on the bribery charge involving Hill. See *State v. Williams* (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323, paragraph six of syllabus. Therefore, we overrule the sixth assignment of error.

In his seventh assignment of error, Knight claims that the state failed to provide him with Woodard's statement until late in the trial, and that this failure violated his right to due process of law. "Prosecutorial violations of Crim.R. 16 [discovery] are reversible only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." See *State v. Joseph* (1995), 73 Ohio St.3d 450, 458, 653 N.E.2d 285, 293.

In this case, there is no indication that the violation was willful. It is apparent from the record that the state was unaware of the statement until it had transcribed a tape recording of an interview with Fangman. The defense knew that Woodard and Fangman were witnesses because Woodard's name had been provided in the bill of particulars and the defense had subpoenaed Fangman to an October 1996 court appearance, which was more than two years before the trial of the case began in April 1999. Furthermore, there is nothing in the record to demonstrate that, had Woodard's statement been disclosed prior to trial, the result of the proceeding would have been different. Although the evidence was not disclosed to the defense prior to trial, the defense obviously knew about Woodard's statement prior to the state's disclosure. In its cross-examination of Hill, the defense asked, "Did Mr. Woodard—Did you ever make an arrangement with Mr. Woodard that you would provide him some type of sexual favor in return for transportation?"

■ In determining whether the state improperly suppressed evidence favorable to Knight, the evidence is considered to be material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." See *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome" of the trial. See *id.* We hold that, in light of all of the evidence, Knight suffered no prejudice from the exclusion of Woodard's statement because we see no reasonable probability that the outcome of the trial would have been different had the statement been admitted. It is clear from the record that the trial court considered all of the evidence before it. The trial court indicated that it found the evidence of the bribery charge involving Hill to be "uncomplicated, believable, and persuasive." Therefore, we overrule the seventh assignment of error.

■ In his eighth and final assignment of error, Knight argues that the trial court erred in overruling his motion to dismiss the bribery counts because R.C. 2921.02(B), the statute under which he was charged, is unconstitutionally vague. Specifically, Knight claims that the element of "duty" within the statute is so vague that ordinary persons must guess at its meaning. We disagree.

■ It is well settled that all legislative enactments must be afforded a strong presumption of constitutionality. See *State v. Anderson* (1991), 57 Ohio St.3d 168, 566 N.E.2d 1224. If at all possible, statutes must be construed in conformity with the Ohio and United States Constitutions. See *State v. Tanner* (1984), 15 Ohio St.3d 1, 2, 15 OBR 1, 2, 472 N.E.2d 689, 690, citing R.C. 1.47. "Mere imprecision does not make a statute void for vagueness." See *State v. Woods* (Sept. 5, 1997), Hamilton App. No. C–950954, unreported, 1997 WL 602963 at * 3.

■ The person challenging the statute must demonstrate that the statute is vague, "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. Cincinnati* (1971), 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214, 217. The following three-part analysis must be applied under the void-for-vagueness doctrine:

■ "These values are first, to provide fair warning to the ordinary citizen so behavior may comport with the dictates of the statute; second, to preclude arbitrary, capricious and generally discriminatory enforcement by officials given too much authority and too few constraints; and third, to ensure that fundamental constitutionally protected freedoms are not unreasonably impinged or inhib-

ited. Proper constitutional analysis necessitates a review of each of these rationales with respect to the challenged statutory language."

*Tanner, supra,* 15 Ohio St.3d at 3, 15 OBR at 3, 472 N.E.2d at 691.

As we noted earlier, R.C. 2921.02(B) provides the following:

"No person, either before or after he is elected, appointed, qualified, employed, summoned, or sworn as a public servant or party official, shall knowingly solicit or accept for himself or another person any valuable thing or valuable benefit to corrupt or improperly influence him or another public servant or party official with respect to the discharge of his or the other public servant's or party official's duty."

The terms "public servant" and "party official" are defined in R.C. 2921.01(B) and (C), respectively.

First, we note that a person of ordinary intelligence would understand that, in the context of the statutory phrase "public servant's or party official's duty," the term "duty" refers simply to the obligations of a public servant or party official in connection with his office. A police officer's duties are defined by statute, rule, regulation and usage. See *Italiano, supra.* Second, the statute is sufficiently explicit to provide law enforcement personnel guidelines as to its proper use, and does not encourage arbitrary enforcement. Finally, the statute does not criminalize a substantial amount of constitutional activity. Therefore, we hold that R.C. 2921.02(B) provides adequate notice and fair warning to persons of ordinary intelligence so that they can conform their conduct to the dictates of the statute. See *State v. Collier* (1991), 62 Ohio St.3d 267, 581 N.E.2d 552. We overrule Knight's final assignment of error.

Therefore, we affirm the judgment of the trial court.

*Judgment affirmed.*

HILDEBRANDT, P.J., and SHANNON, J., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.