OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Defendant-Appellant, Anil Bajaj, appeals the decision of the Columbiana County Court of Common Pleas that found him guilty of one count of sexual battery and one count of gross sexual imposition and sentenced him accordingly. He raises a variety of issues on appeal, ranging from trial errors to sentencing errors to whether his convictions are supported by sufficient evidence. We conclude that the majority of his assignments of error are meritless. However, we do find merit in his second assignment of error, which deals with whether his conviction for sexual battery is supported by insufficient evidence.
 {¶ 2} A person is guilty of sexual battery if that person knowingly coerces another person who is not their spouse into sexual conduct by any means that would prevent resistance by a person of ordinary resolution. Under Ohio's current statutory scheme, the fact that the defendant is the victim's doctor is insufficient to show that the doctor has coerced the victim to such an extent a person of ordinary resolution could not resist the sexual conduct. The only evidence of coercion in this case besides that fact that Bajaj is a doctor is that the examination table was up against the wall. This is insufficient to show that a person of ordinary resolution could not resist his advances. Accordingly, the trial court's decision is affirmed in part, reversed in part, and Bajaj's conviction for sexual battery is vacated.
 Facts {¶ 3} In July 2001, Bajaj was a licensed doctor who was practicing with Dr. Robert Beatty in Dr. Beatty's offices in East Liverpool, Ohio. Bajaj was also affiliated with the East Liverpool City Hospital and had privileges to practice there.
 {¶ 4} On July 27, 2001, Bajaj saw a variety of patients, but his last patient before lunch was Christine Mott and his last patient of the day was Jaime Rodgers. Mott was a registered nurse at the East Liverpool City Hospital. She knew of Bajaj through the hospital and, by July 2001, had been his patient for about a year. Her main complaint was chest pain, but that day it appears she was also suffering from bronchitis.
 {¶ 5} In July 2001, Rodgers was studying to become an x-ray technician, although not at the East Liverpool City Hospital. She first saw Bajaj in June 2001 after another doctor told her that he may be able to help her with her foot problem. Rodgers had been diagnosed with plantar faceitis, a painful foot condition. Rodgers' condition was so severe that she visited the emergency room between her first and second appointments with Bajaj. On her first visit, Bajaj performed a complete physical on Rodgers. While conducting that physical, Bajaj noticed some irregularities and ordered Rodgers to get an echocardiogram. The July 27th visit was a follow-up appointment.
 {¶ 6} Mott testified that when she arrived for her appointment she was placed in the examination room and that Bajaj acted inappropriately. According to Mott, Bajaj heard her cough and had her lay down on the examination table, lift her shirt, and take off her bra. Mott then alleged that Bajaj began feeling and squeezing her breasts. She further claimed that Bajaj told her that her breasts were beautiful and began licking and kissing her hand. Mott told Bajaj that she was not interested, but he asked her to meet him outside. He then tried to kiss her and asked her for a hug. When she refused he suggested she see another doctor. Bajaj testified that Mott's version of events was an exaggeration and gave a medical explanation for a tamer version of events.
 {¶ 7} Rodgers also testified that Bajaj acted inappropriately during her appointment. According to Rodgers, Bajaj spoke with her about her echocardiogram, then ordered her to lay on the examination table and lift her shirt. She lifted her shirt and he squeezed her nipple. He then said, "Beautiful," which Rodgers took to mean that there were no problems. She then testified that Bajaj told her to lower her pants and underwear and she complied. According to Rodgers, Bajaj then began pressing toward her pubic area with his hands and put his finger "inside the folds of her vagina back towards where [her] tampon was." He then removed his hand from her pubic area. She then said that Bajaj tried to kiss her as she sat up. According to Rodgers, Bajaj asked for one kiss or one hug and kissed her on the cheek. Bajaj also testified that Rodgers exaggerated and gave a medical explanation for a tamer version of events.
 {¶ 8} The Columbiana County Grand Jury returned an indictment charging Bajaj with one count of sexual battery against Rodgers. It later returned a separate indictment charging Bajaj with one count of gross sexual imposition against Mott.
 {¶ 9} The cases were originally scheduled to be tried separately and the sexual battery charge went to trial in June 2002. During the course of trial some jurors improperly looked at a newspaper article and the trial court declared a mistrial. Defense counsel then moved that the case be joined and both proceeded to a jury trial. At the conclusion of that trial, the jury found Bajaj guilty on both counts. Baja was then sentenced to more than the minimum but less than the maximum possible prison term on each count and ordered to pay restitution. The trial court ordered that the two sentences be served consecutively.
 {¶ 10} Bajaj has raised seven assignments of error on appeal. Those assignments of error deal with trial errors, sentencing errors, and whether his convictions were supported by insufficient evidence. In order to ease our analysis, we will reformulate the issues Bajaj raised.
 Sufficiency of the Evidence Standard of Review {¶ 11} In his second and third assignments of error, Bajaj claims that each of his convictions is not supported by sufficient evidence. More specifically, he argues:
 {¶ 12} "The evidence presented by the State on the charge of sexual battery was insufficient as a matter of law."
 {¶ 13} "The evidence presented by the State on the charge of gross sexual imposition was insufficient as a matter of law."
 {¶ 14} "Sufficiency of the evidence" is "'a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" State v. Thompkins, 78 Ohio St.3d 380,386, 1997-Ohio-0052, quoting Black's Law Dictionary (6th Ed. 1990) 1433. The relevant inquiry when determining whether the evidence is sufficient to support the verdict "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts." Id. at 273. Whether the evidence is legally sufficient is a question of law. Thompkins at 386.
 Gross Sexual Imposition {¶ 15} Bajaj argues that there was insufficient evidence proving that he was guilty of committing gross sexual imposition against Mott because there was no evidence that he used some sort of force or threat of force when committing the offense. Thus, he believes he could not be guilty of gross sexual imposition.
 {¶ 16} Bajaj was convicted of gross sexual imposition under R.C.2907.05(A)(1). That statute provides: "(A) No person shall have sexual contact with another, not the spouse of the offender * * * when * * * (1) The offender purposely compels the other person * * * to submit by force or threat of force." Id. R.C. 2901.01(A)(1) defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." Force and threat of force "can be inferred from the circumstances surrounding sexual conduct." State v. Schaim,65 Ohio St.3d 51, 1992-Ohio-0031, paragraph one of the syllabus. The forcible element of gross sexual imposition is established where a defendant's actions create "the belief that physical force will be used if the victim does not submit" to the defendant's actions. Id. "A victim need not prove physical resistance to the offender" for a defendant to be found guilty of gross sexual imposition. R.C. 2907.05(C).
 {¶ 17} Appellate courts have found sufficient evidence of force even if the victim was asleep when the offense was committed. For instance, inState v. Sullivan (Oct. 7, 1993), 8th Dist. No. 63818, the sleeping victim awoke to find the defendant performing oral sex on her. In finding the requisite element of force present, the Eighth District noted that "any" compulsion could establish force as defined in the statute, and observed that the evidence demonstrated that in committing the offense, the defendant had removed the victim's clothing and repositioned her body. Similarly, in State v. Lillard (May 23, 1996), 8th App. No. 69242, that court found the element of force present where the defendant "used physical exertion to position [the victim's] robe and legs." And in Statev. Byrd, 8th Dist. No. 82145, 2003-Ohio-3958, ¶ 24, that same court affirmed a conviction for gross sexual imposition under R.C. 2907.05(A)(1) when the defendant waited until the girl had fallen asleep, sat next to her on the couch, placed her legs on his lap, and displaced her clothing. These cases are all contrary to the case Bajaj cites in his brief for the proposition that rearranging someone's body is insufficient to prove force. See State v. Cohen (1978), 60 Ohio App.2d 182, paragraph one of the syllabus.
 {¶ 18} Other courts have found sufficient evidence on the forcible element of the offense when the defendant used his hands to move the victim's body into certain positions as a precursor to the various sexual acts and spoke sternly and emphatically. State v. Hurst (Mar. 7, 2000), 10th Dist. No. 98AP-1549.
 {¶ 19} In this case, there is sufficient evidence in the record to support this element. Mott testified that her left side was against a wall while Bajaj squeezed her breasts and that he was holding her right hand. While Bajaj fondled her breasts, Mott "tried to pull back and he just kept squeezing my hand and he was pushed into me. I could feel his stomach up against my right side" These actions fall within the statutory definition of force since it is "constraint physically exerted by any means upon or against a person," especially given the minimal force exerted by similar defendants whose convictions were affirmed on appeal. Accordingly, Bajaj's third assignment of error is meritless.
 Sexual Battery {¶ 20} Bajaj contends that his conviction for sexual battery is not supported by sufficient evidence because there is no evidence that he coerced Rodgers into submitting to his advances by means that would prevent resistance by a person of ordinary resolution. The State argues that Bajaj's position of authority as a doctor and the circumstances of the examination were sufficient to prove that he coerced her by means that would prevent resistance by a person of ordinary resolution.
 {¶ 21} Bajaj was convicted of sexual battery under R.C. 2907.03(A)(1). That statute provides: "(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * (1) The offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution." Id. To put it simply, sexual battery is rape with a lesser mens rea and "coercion" rather than simply "force." See State v. Wilkins (1980), 64 Ohio St.2d 382,386-387; State v. Stricker, 10th Dist. No. 03AP-746, 2004-Ohio-3557.
 {¶ 22} The Revised Code does not define "coercion", but the commentary to R.C. 2907.03 concludes that "sexual conduct by coercion * * * is somewhat broader than sexual conduct by force." In Wilkins, the Ohio Supreme Court agreed with this commentary, holding that "[f]orce or the threat of force will always constitute coercion that would prevent resistance by a person of ordinary resolution." See also State v.Tolliver (1976), 49 Ohio App.2d 258, 263-264; State v. Byrd, 8th Dist. No. 80609, 2002-Ohio-5838, ¶ 37; In re Jordan (Sept. 12, 2001), 9th Dist. No. 01CA007804; State v. Jenkins (Jan. 20, 1993), 3rd Dist. No. 9-92-25; State v. Skaggs (June 12, 1990), 10th Dist. No. 89AP-528. Thus, as the Ninth District said in Jordan, "[c]oercion means to compel by pressure, threat, force or threat of force." Id.
 {¶ 23} In this case, the State does not argue that Bajaj either used or threatened force in order to engage in sexual conduct with Rodgers because there is no evidence showing force or threat of force. Rodgers laid down on the table herself, pulled up her shirt herself, lowered her pants herself, and lowered her underwear herself. Likewise, Bajaj did not resist Rodgers when she sat up after inserting his fingers into the inside folds of her vagina. Instead, the State argues that Bajaj's inherent authority as a doctor would prevent resistance by a person of ordinary resolution. We cannot accept this argument under current Ohio law.
 {¶ 24} The Ohio Supreme Court has held that a defendant has not committed sexual battery if the only evidence of coercion is the relationship between the defendant and the victim unless the statute specifically provides otherwise. In State v. Noggle, 67 Ohio St.3d 31, 1993-Ohio-0189, a high school teacher and coach was charged with sexual battery as a result of sexual conduct he allegedly engaged in with a student. The Ohio Supreme Court held that this was not a sexual battery as that crime was defined at that time since the offender's status as a teacher was not listed by the statute as one where the offender has an inherently unconscionable advantage over the victim.
 {¶ 25} "Consensual sexual conduct between persons over sixteen years of age, as was apparently the situation in this case, is generally legal in Ohio. The intent of R.C. 2907.03 is to forbid sexual conduct in a variety of situations where the offender takes unconscionable advantage of the victim. The complete list of situations stated in the statute is relevant to an analysis of the claim against Noggle. The statute reads:
 {¶ 26} "`(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:
 {¶ 27} "`(1) The offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution.
 {¶ 28} "`(2) The offender knows that the other person's ability to appraise the nature of or control his or her own conduct is substantially impaired.
 {¶ 29} "`(3) The offender knows that the other person submits because he or she is unaware that the act is being committed.
 {¶ 30} "`(4) The offender knows that the other person submits because such person mistakenly identifies the offender as his or her spouse.
 {¶ 31} "`(5) The offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis.
 {¶ 32} "`(6) The other person is in custody of law or a patient in a hospital or other institution, and the offender has supervisory or disciplinary authority over such other person."
 {¶ 33} "The General Assembly envisioned a variety of specific situations where an offender might take unconscionable advantage of a victim. The teacher-student relationship is not, however, included as one of those situations. That fact is telling. The statute is very specific, going so far as to forbid sexual conduct between prison workers and prisoners as well as between hospital workers and patients. Had the General Assembly sought to forbid sexual conduct between teachers and students, it would have done so specifically." Id. at 32-33.
 {¶ 34} As the Ohio Supreme Court explained, "[w]hat Dale Noggle is accused of doing is wrong in the eyes of his profession and in the eyes of society. What Dale Noggle is accused of doing, however, is not considered a [sexual battery] by the state of Ohio." Id. at 32.
 {¶ 35} Since the Ohio Supreme Court decided Noggle, the legislature amended it, making it even more specific than it was when Noggle was decided. In addition to the six categories listed above, the statute now contains five additional categories, R.C. 2907.03(7) to (11). Those subsections list these additional prohibited scenarios:
 {¶ 36} "(7) The offender is a teacher, administrator, coach, or other person in authority employed by or serving in a school for which the state board of education prescribes minimum standards pursuant to division (D) of section 3301.07 of the Revised Code, the other person is enrolled in or attends that school, and the offender is not enrolled in and does not attend that school.
 {¶ 37} "(8) The other person is a minor, the offender is a teacher, administrator, coach, or other person in authority employed by or serving in an institution of higher education, and the other person is enrolled in or attends that institution.
 {¶ 38} "(9) The other person is a minor, and the offender is the other person's athletic or other type of coach, is the other person's instructor, is the leader of a scouting troop of which the other person is a member, or is a person with temporary or occasional disciplinary control over the other person.
 {¶ 39} "(10) The offender is a mental health professional, the other person is a mental health client or patient of the offender, and the offender induces the other person to submit by falsely representing to the other person that the sexual conduct is necessary for mental health treatment purposes.
 {¶ 40} "(11) The other person is confined in a detention facility, and the offender is an employee of that detention facility."
 {¶ 41} Thus, the statute now specifically prohibits sexual conduct between "a patient in a hospital or other institution" and someone with "supervisory or disciplinary authority over" that patient (R.C.2907.03(A)(6)) and "a mental health professional" and that person's "client or patient," but it does not specifically prohibit sexual conduct between doctors and their patients. What Noggle says about teachers applies to doctors.
 {¶ 42} R.C. 2907.03(A)(5)-(11) do not specify any degree of culpability and specifically apply to situations where the defendant has a position of authority to prevent the defendant from taking unconscionable advantage of the victim. Noggle at 32. Thus, under those sections, a defendant is still guilty of the offense even if both the defendant and the victim testified that the sexual conduct was consensual. The legislature has clearly chosen that, in certain situations, the defendant's position of authority confers criminal liability for sexual conduct with someone under their direct control or supervision. State v. Singleton, 11th Dist. No. 2002-L-077, 2004-Ohio-1517, at ¶ 56. Had the General Assembly sought to protect all patients from the sexual advances of their doctors, it would have done so specifically. The specific sections of R.C. 2907.03(A)(5)-(11) prevent a finding of guilt in this case based purely on Bajaj's status as a doctor.
 {¶ 43} We emphasize that we are bound by both the statute and the Ohio Supreme Court's decision in Noggle when reaching this conclusion. We understand the State's argument; a doctor is in a position of authority and patients are taught to follow their doctors' instructions. But we do not see how the doctor-patient relationship is materially different than the teacher-patient relationship addressed in Noggle. Nor has the State presented us with any argument of any material difference. Furthermore, following Noggle, the legislature could have made the statute less specific, rather than making it even more specific. This would have avoided the type of analysis the Ohio Supreme Court applied in Noggle. By making the statute even more specific, the legislature has demonstrated that it adopted Noggle's analysis and makes us even more sure that we cannot find that a defendant has coerced a victim simply because the victim was the defendant's patient. If the citizens of this State disagree with this conclusion, then the legislature should amend the statute to include this type of relationship.
 {¶ 44} Regardless, the fact that the legislature has not criminalized all sexual conduct between a doctor and patient, or between others in positions of authority and those they directly control or supervise, does not mean that fact-finders may not consider the defendant's status when determining whether the coercion employed was sufficient to prevent resistance by a person of ordinary resolution. For instance, in State v.Knight (2000), 140 Ohio App.3d 797, and State v. Walker (2000),140 Ohio App.3d 445, police officers were convicted of sexual battery because they used their positions as police officers to coerce the victims into submitting to sexual conduct. And if a doctor refused to write a prescription for a patient unless the patient submitted to sexual conduct, then we would not say that the jury would have to ignore the fact that he was a doctor when he tried to coerce his patient in this manner. Thus, the question becomes not whether Bajaj coerced Rodgers, but whether the manner in which he tried to coerce her was sufficient to prevent resistance by a person of ordinary resolution.
 {¶ 45} When looking at the facts of this case in the light most favorable to the prosecution, we fail to see how any reasonable fact-finder could conclude that the means of coercion Bajaj used in this case would prevent resistance by a person of ordinary resolution. Rodgers was studying to become an x-ray technician in July 2001, but not at the hospital where Bajaj worked. She did not have an established doctor-patient relationship with Bajaj at the time of the incident since she had only been to see him once before. She first went to him because of foot pain and was returning for this second appointment to get the results of an echocardiogram. After telling Rodgers the result of that test, Bajaj asked her to get back on an examination table located in the corner of the room, with a wall to Rodgers's left and behind her head. Bajaj stood to Rodgers's right while he asked her to lift her shirt and bra and lower her pants and underwear. After she did so, he moved his hand down her abdomen until his fingers reached the inside folds of her vagina. When Rodgers resisted, he removed his hand.
 {¶ 46} We fail to see how this situation is so coercive that a person of ordinary resolve would not resist the sexual conduct. Bajaj did not threaten to withhold any kind of medical treatment from Rodgers or her family (such as a referral to a specialist or a prescription) if she did not submit to his advances and Rodgers never testified that she understood that he was making that kind of threat. He did not pressure her into submitting to the sexual conduct by telling her that it was necessary for treatment purposes. And Bajaj did not use force or threat of force to coerce her into submitting to the sexual conduct.
 {¶ 47} We acknowledge that the position of the table against the wall may have been more coercive than it would have been had the table been away from the wall since Bajaj could block the only easy exit from the table. But this fact alone is insufficient to demonstrate that Bajaj could then have overcome the resistance of a person of ordinary resolve. Given the Ohio Supreme Court's decision in Noggle, we do not believe the State presented sufficient evidence to charge the jury on the offense of sexual battery against Rodgers.
 {¶ 48} It is important to note that our conclusion does not mean that Bajaj's actions against Rodgers did not constitute any criminal offense. For instance, we find it rather likely that the jury would have convicted Bajaj of sexual imposition if given the chance. R.C. 2907.06(A)(1) provides:
 {¶ 49} "No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * (1) The offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard."
 {¶ 50} It would not be difficult for the prosecutor to have proven that Bajaj was reckless with regard to whether his conduct was offensive to Rodgers. But the fact remains that the jury did not find him guilty of this offense. Instead, it found him guilty of sexual battery. The evidence does not support this conviction, thus Bajaj's conviction for sexual battery must be vacated. His second assignment of error is meritorious.
 Trial Errors {¶ 51} Bajaj's first, fifth, and sixth assignments of error all deal with errors that happened at trial. They argue:
 {¶ 52} "Appellant was harmed by the introduction of a significant amount of inadmissible, irrelevant and highly prejudicial evidence."
 {¶ 53} "Prosecutorial misconduct denied appellant his right to a fair trial under both the Ohio and United States Constitutions."
 {¶ 54} "Appellant was denied his right under both the Ohio and United States Constitutions to the effective assistance of counsel."
 {¶ 55} Bajaj addresses many of the same basic errors through the different lenses of these assignments of error. For instance, Bajaj challenges the propriety of allowing a rebuttal witness in each of these assigned errors. But each of these arguments also contains distinct issues not addressed in any of the others. For clarity's sake, we will first address the issues common to more than one of these assignments of error. We will then address the errors unique to each assigned error.
 Standards of Review {¶ 56} Because many of Bajaj's arguments overlap, we must apply a variety of standards of review to the same set of facts. The following standards of review apply to the arguments in Bajaj's first, fifth, and sixth assignments of error.
 {¶ 57} Many of Bajaj's arguments deal with matters which are in the sound discretion of the trial court. When reviewing those matters, we will not reverse the trial court's decision unless it has abused that discretion. See Ramage v. Central Ohio Emergency Serv., Inc.,64 Ohio St.3d 97, 1992-Ohio-0109, paragraph six of the syllabus. The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 58} In many cases, Bajaj did not specifically object to the matters he now claims as error on appeal. Those questions not objected to are reviewed under the plain error standard found in Crim.R. 52(B). "`Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" State v. Manley, 71 Ohio St.3d 342, 347, 1994-Ohio-0440, quoting State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. "`Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise.'" Id., quoting State v. Moreland (1990), 50 Ohio St.3d 58, 62.
 {¶ 59} Bajaj also argues that the prosecution's actions constitute prosecutorial misconduct. The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. Statev. Fears (1999), 86 Ohio St.3d 329, 332, 1999-Ohio-0111. In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected substantial rights of the appellant. State v. Smith (1984),14 Ohio St.3d 13, 14-15. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" State v. Hanna,95 Ohio St.3d 285, 2002-Ohio-2221, ¶ 61, quoting Smith v. Phillips
(1982), 455 U.S. 209, 219. An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. State v. LaMar, 95 Ohio St.3d 181,2002-Ohio-2128, ¶ 121. A failure to object to alleged prosecutorial misconduct waives all but plain error. Hanna at ¶ 77; LaMar at ¶ 126.
 {¶ 60} Finally, Bajaj argues his trial counsel was ineffective in relation to many of these matters. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate counsel's performance was deficient and that deficient performance prejudiced the defense.Strickland v. Washington (1984), 466 U.S. 668, 687. A properly licensed attorney is presumed to execute his duties in an ethical and competent manner. State v. Smith (1985), 17 Ohio St.3d 98, 100. When reviewing whether counsel's performance was ineffective, courts must refrain from second-guessing strategic decisions of trial counsel. State v. Sallie,81 Ohio St.3d 673, 674, 1998-Ohio-0343. Ineffectiveness is demonstrated by showing counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. State v.Hamblin (1988), 37 Ohio St.3d 153, 156. To establish prejudice, a defendant must show there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. Strickland at 694. A reasonable probability must be a probability sufficient to undermine confidence in the outcome of the case. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. The defendant bears the burden of proof in demonstrating ineffective assistance of counsel. Smith at 100.
 Rebuttal Witness {¶ 61} In his first, fifth, and sixth assignments of error, Bajaj claims it was error for the trial court to allow Melvin Creeley, the hospital's president and CEO, to testify as a surprise rebuttal witness, that the prosecutor committed misconduct by not timely disclosing this witness, and that his counsel was ineffective for not requesting a continuance so he could adequately prepare to cross-examine this rebuttal witness.
 {¶ 62} The State contends that Creeley was not a surprise rebuttal witness and that defense counsel had "as much time as he wanted" to prepare for Creeley's testimony. But the State admits that this is not reflected in the record. The State further argues that Bajaj did not object to Creeley's testimony. Finally, the State contends that Bajaj was not materially prejudiced by Creeley's testimony even if that testimony was improperly admitted.
 {¶ 63} Creeley's testimony was damning. Bajaj admitted to many of the facts alleged by both Mott and Rodgers, but testified that his actions were all for medical reasons, that he did not do anything inappropriate, and that Mott and Rodgers were exaggerating their claims. After Bajaj testified, the State called Creeley on rebuttal. He testified that he confronted Bajaj about Mott's allegations before the Rodgers story was in the newspaper. According to Creeely, Bajaj told him, "I'm sorry for that I did. Will you please make it go away?" Thus, Creeley testified that Bajaj admitted some wrongdoing. This directly contradicts Bajaj's testimony, since he claimed he did not do anything wrong.
 {¶ 64} Bajaj did not object when Creeley was called to testify as a rebuttal witness, did not voir dire Creeley to establish whether his testimony was truly rebuttal testimony, did not request a continuance to prepare for Creeley's testimony, did not object to any of Creeley's testimony, and did not request that the trial court instruct the jury that it could only consider Creeley's testimony for the purpose of rebutting Bajaj's testimony. Thus, we can only reverse Bajaj's conviction for reasons relating to Creeley's testimony if the prosecutor committed misconduct by not disclosing that Creeley would testify sooner, that the trial court plainly erred by allowing Creeley's testimony, or that Bajaj's counsel was ineffective for not taking one of the actions listed above.
 {¶ 65} The prosecutor did not commit misconduct by not disclosing that Creeley would testify sooner. There is nothing in the record to support Bajaj's claim that the State delayed identifying Creeley as a witness. Bajaj testified on the second day of trial. Creeley testified that he first spoke with the prosecutor on the evening of the second day of trial. The prosecutor issued a subpoena to Creeley that night and called Creeley to testify on the third day of trial.
 {¶ 66} Furthermore, Bajaj's own actions demonstrate that he was prepared for Creeley's testimony. Bajaj did not object when the State called Creeley in rebuttal and did not request a continuance. In the absence of a motion to continue in this situation, a trial court may properly conclude that defense counsel is prepared to go forward at that time. State v. Finnerty (1989), 45 Ohio St.3d 104, 108. Furthermore, Bajaj's counsel asked Creeley pointed, fact-specific questions. For instance, he asked Creeley if anyone else was present for the conversation, even naming someone that counsel apparently believed was there. Accordingly, the prosecutor did not commit misconduct by untimely disclosing that he would call Creeley as a witness and Bajaj was not prejudiced by the late disclosure.
 {¶ 67} The trial court did not plainly err by allowing Creeley's testimony. Creeley's testimony was obviously rebuttal evidence. It directly contradicted Bajaj's testimony by showing that he had previously admitted that his actions were not proper. Counsel was prepared for Creeley's testimony; he asked pointed, fact-specific questions when cross-examining Creeley. And Bajaj should not have been surprised about the content of that testimony since it concerned a statement that he allegedly made; hence, it should have been within his knowledge. See id. Finally, the decision over whether to allow Creeley's testimony is within the trial court's sound discretion and the trial court may allow a rebuttal witness to testify even if the prosecutor did not disclose the existence of this witness prior to trial. Id. Given these facts of this case, the trial court would not have abused its discretion if it allowed Creeley to testify over objection. Thus the trial court's decision was not error, let alone plain error.
 {¶ 68} Finally, counsel was not ineffective for failing to challenge Creeley's testimony or ability to testify. As stated above, the trial court would not have erred by allowing Creeley's testimony even if Bajaj's counsel objected to that testimony. Accordingly there is not a reasonable probability that the outcome would have been different if Bajaj's counsel had tried to challenge Creeley's ability to testify
 {¶ 69} Bajaj's arguments relating to Creeley's testimony all are meritless.
 Expert's Opinion on the Veracity of a Witness {¶ 70} In his first, fifth, and sixth assignments of error, Bajaj also claims it was error for the trial court to allow the victims' counselors and therapists to give an opinion on the truthfulness of the victims' testimony and that the prosecutor committed misconduct by improperly using the experts' testimony to bolster the victims' credibility. Bajaj also claims his counsel was ineffective since he did not object to this testimony.
 {¶ 71} In response, the State argues that the experts' did not give opinions on the truthfulness of the victims' testimony. The State contends that these experts were used to explain the victims' subsequent actions and that this is a proper purpose for expert testimony. Thus, the State denies that it was error to allow this testimony, that it committed prosecutorial conduct by referring to this testimony in closing arguments, and that counsel was ineffective for failing to object to this testimony.
 {¶ 72} It is reversible error to admit testimony from a purported expert or lay witness attesting to the believability of another's statements. State v. Boston (1989), 46 Ohio St.3d 108, 128. "[I]n our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses." State v. Pizzillo, 7th Dist. No. 746, 2002-Ohio-0446, citing Boston at 129. But an expert witness can give an opinion which either supports the truth of the facts testified to by a witness or assists the fact finder in assessing the witness's veracity. State v.Stowers (1998), 81 Ohio St.3d 260, 262-263. For instance, in Stowers the Ohio Supreme Court held an expert could testify that the behavior of the victims was consistent with the behavior of other sexually abused victims. Id. at 260.
 {¶ 73} In this case, each expert testified that each victim suffered from posttraumatic stress disorder and that the victims did not display any evidence of malingering. The Ohio Supreme Court has held that post-traumatic stress disorder is a proper subject of expert testimony and can help a jury determine whether someone has been raped or sexually assaulted. State v. Bidinost, 71 Ohio St.3d 449, 453, 1994-Ohio-0465. Thus, the real focus of Bajaj's arguments are on the experts' statements that the victims did not display any evidence of malingering.
 {¶ 74} Rodgers' counselor testified first and did not mention malingering on direct examination. On cross examination, defense counsel asked her if she was familiar with malingering. The counselor testified that she was and agreed with defense counsel's definition of malingering. Defense counsel never asked the witness if she believed Rodgers was malingering, but this is clearly the impression he intended to leave in the minds of the jury. While discussing malingering, defense counsel also had the counselor testify that she knew that Rodgers had filed a civil action against Bajaj. On redirect examination, the prosecutor asked Rodgers' counselor whether Rodgers had displayed any symptoms of malingering and the counselor replied in the negative. Both then asked additional questions on the subject in recross and a subsequent redirect.
 {¶ 75} Mott's psychotherapist testified immediately after Rodgers' counselor. At the end of her direct examination, the prosecutor asked her if Mott displayed any symptoms of malingering. Mott's psychotherapist replied in the negative. Bajaj's counsel did not raise the issue on cross examination and the prosecutor did not conduct a redirect examination of this witness.
 {¶ 76} In his closing argument, the prosecutor made the following statement about the counselors:
 {¶ 77} "That takes me into, of course, the testimony of the psychiatric, psychological, I should say, professionals who testified here yesterday. First testifying on behalf of the State of Ohio was Pat Taylor, Jamie Rodgers' counselor. Next testifying on behalf of the State was Dr. Ronnie Rittenhaus from Weirton, both very experienced, very professional type counselors. Their testimony mainly concentrated on their diagnosis and treatment of both victims for post traumatic stress syndrome, PTSD.
 {¶ 78} "They explained, I feel very well, the concept of PTSD, that it is caused by some sort of triggering, traumatic event. And that triggering, traumatic event in both of these young women's situations, what he did to them in that office on July 27, 2001.
 {¶ 79} "Beyond that testimony, however, of their problems with post traumatic stress and the symptoms, the classic symptoms that each victim exhibited, they further testified, and this was brought up, if you recall, by [Bajaj's counsel], that they found no psychological or psychiatric signs of fabrication. I think the term that [Bajaj's counsel] brought up and it's the first time I've heard it yesterday was malingering. Certainly both these professional counselors were familiar with it, but they certainly found no evidence in counseling either of these victims that met the diagnostic criteria of malingering or fabrication, whatever you want to call it, in any way, in any way whatsoever."
 {¶ 80} The prosecutor then went on to describe how Mott's counselor testified that Mott's actions were consistent with someone who was in shock.
 {¶ 81} The trial court did not err when it allowed the prosecutor to ask these experts whether the victims displayed any signs of malingering. Defense counsel first raised the issue. He may not have asked Rodgers' counselor if she believed that Rodgers was malingering, but his questions clearly implied as much. His line of questioning invited the type of normally inadmissible questions that the prosecutor asked of the counselors. See Pizzillo. Furthermore, the prosecutor could not have challenged defense counsel's line of inquiry in a different, less egregious manner. See contra State v. Kovac, 150 Ohio App.3d 676,2002-Ohio-6784 (A prosecutor is not allowed to ask for opinions barred byBoston if he could use a more limited line of questioning to challenge defense counsel's line of inquiry). Finally, since defense counsel's line of questioning allowed the prosecutor to ask this question, the prosecutor did not commit misconduct during closing arguments when referring to the counselors' opinions that the victims were not malingering.
 {¶ 82} In addition, defense counsel was not ineffective for raising the issue of malingering. Part of counsel's trial strategy was to make the jurors believe that Mott and Rodgers had fabricated their stories. In his opening statement, defense counsel said that the victims' claims "do not pass the smell test. They stink. Something is wrong." He then went on to list a variety of "coincidences" which he claimed made the victims' testimony suspect. He concluded as follows:
 {¶ 83} "And the ultimate motive in this, I think you will see by the end of this is that you had a very young lady who made up a story. You had someone else who jumped on the bandwagon and both of them have jointly obtained counsel to sue Dr. Bajaj and Dr. Beatty for money. That's the motive for these lies. If you want motive, money is the motive, okay? Are they willing to destroy his life? Yes, they are."
 {¶ 84} Defense counsel reiterated these themes in his closing argument. He again commented on the similarity between the victims' description of events and accused them of fabricating their stories for money. He concluded by once again telling the jury "that this case smells."
 {¶ 85} Normally, when defense counsel fails to object to testimony prohibited by Boston, then counsel's performance falls below an objective standard of reasonable representation. State v. Huff (2001),145 Ohio App.3d 555, 561; State v. Jones (1996), 114 Ohio App.3d 306,318. But in this case, this testimony was necessary to counter the defense counsel's implication that the victims were malingering. Defense counsel made a strategic decision that he should ask those questions to question the victims' credibility. We refrain from second-guessing trial counsel's strategic decisions when reviewing an ineffective assistance of counsel claim. State v. Carter (1995), 72 Ohio St.3d 545, 558. Accordingly, Bajaj's defense counsel was not ineffective for asking the victims' counselors about malingering and not objecting to the prosecutor's subsequent questions and statements. Bajaj's arguments regarding the counselors' testimony are meritless.
 References to Prior Trial {¶ 86} In his first and sixth assignments of error, Bajaj claims that the trial court erred by allowing witnesses to comment on the fact that there was a prior trial and that his counsel was ineffective for mentioning that fact to the jury. According to Bajaj, the instruction the trial court gave to the jury about the prior trial did not cure the error.
 {¶ 87} The State responds that Bajaj has failed to demonstrate how the references to the prior trial prejudiced him and contends that this court should not presume prejudice in that situation. Finally, the State contends that we must presume that the jury followed the trial court's instructions and disregarded the fact that Bajaj was tried previously.
 {¶ 88} Courts do not encourage references to prior trials or hearings. See State v. Hatcher (1996), 108 Ohio App.3d 628, 631 ("We do not condone referring to the previous trial where we have remanded a cause for a new trial."); State v. Hopfer (1996), 112 Ohio App.3d 521,540 ("Generally, the state is not permitted to refer to previous trials or hearings of the same cause of action for the same defendant."). But the Ohio Supreme Court has held that these references are not inherently prejudicial and that a prosecutor may specifically refer to a prior trial in certain circumstances.
 {¶ 89} In State v. Keenan, 81 Ohio St.3d 133, 1998-Ohio-0459, the Ohio Supreme Court was asked to find error when the prosecutor cross-examined defense witnesses on whether they had come forward to testify at a prior trial. The Ohio Supreme Court refused to do so. It held a witness's failure to come forward earlier with relevant information affects his credibility and that a prosecutor could properly use the failure to come forward to testify at the first trial to impeach the witness. Id. at 150. Thus, there was no error even though the prosecutor referred to the prior trial.
 {¶ 90} Even the cases which have not condoned this practice have refused to reverse a conviction because of references to a prior trial. For instance, in Hatcher, the First District found no plain error when defense counsel did not timely object to allow the trial court to instruct the jury or to strike the question, and when defense counsel implicitly, if not explicitly, agreed to continue without action by the trial court. Id. at 631. And in Hopfer, the Second District held that references to a "first trial" did not prejudice the defendant's right to a fair trial. Id. at 540.
 {¶ 91} In State v. Davis (Mar. 2, 1994), 3rd Dist. No. 13-93-24, defense counsel told the jury during voir dire that this trial was the second time the case had been tried to a jury and other generalized references to the prior trial were made during trial. The Third District found that counsel was not ineffective for making these references. "Appellant's claim of prejudice resulting from the jury's knowledge that there had been a prior trial is unfounded. The possibility the jury misused this information is speculation by appellant. Furthermore, the trial court gave sufficient curative instructions to correct any potential harm to appellant." Id. at 3.
 {¶ 92} It would be much more prejudicial for a party to refer to the outcome of a prior court proceeding, especially if that outcome was adverse to either party. See Jones v. Keller (1966), 9 Ohio App.2d 210,212; 90 O.Jur.3d 43, section 414. But that is not the case here.
 {¶ 93} In this case, both attorneys made generalized references to the fact that there was a prior trial and some of the witnesses' testimony could be interpreted as references to a prior trial. But the trial court instructed the jury as follows:
 {¶ 94} "Now, during the trial it has been mentioned that a part of this case was called for trial previously. You are instructed that those proceedings could not be concluded due to juror misconduct outside the courtroom that was not the fault of any party or attorney. No verdict was reached in that trial and consequently, that proceeding has nothing whatsoever to do with this trial."
 {¶ 95} Any prejudice which Bajaj could have suffered by the generalized reference to a prior trial was mitigated by the trial court's instruction. The trial court instructed the jury that it was not the parties' fault that the prior trial could not be concluded and that it should disregard the fact that Bajaj was previously tried for one of these charges. Ohio juries are presumed to follow the trial court's instruction. State v. LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 92. The trial court did not plainly err in this regard. Likewise, counsel was not ineffective regarding the references to the prior trial. Bajaj's arguments to the contrary are meritless.
 Pre-Arrest Silence {¶ 96} In his first and fifth assignments of error, Bajaj claims the trial court erred by allowing the prosecution to use his silence against him and that the prosecutor committed misconduct by doing so. He claims two different lines of inquiry violated this right: 1) the police officer's testimony that he could not contact Bajaj over the weekend following the incidents and 2) Creeley's testimony that Bajaj did not challenge the administrative suspension of his privileges at the East Liverpool City Hospital.
 {¶ 97} In response, the State contends that neither of these lines of inquiry involved an invocation of Bajaj's right to remain silent. Accordingly, it believes its actions did not violate Bajaj's rights.
 Pre-Arrest Silence for Impeachment {¶ 98} The United States Supreme Court has held that the State may use a criminal defendant's pre-arrest silence to impeach his credibility. SeeJenkins v. Anderson (1980), 447 U.S. 231. The use of this silence for impeachment does not violate the Fifth Amendment since "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." Id. at 238. And it does not violate the Fourteenth Amendment since no governmental action induced the petitioner to remain silent before arrest if the failure to speak occurred before the defendant was taken into custody and given the Miranda warnings. Id. at 240. The Ohio Supreme Court has recognized and applied this decision, most recently in Statev. Leach, 102 Ohio St.3d 135, 2004-Ohio-2147, at ¶ 20-22.
 {¶ 99} The officer's testimony was not used to impeach Bajaj since it was presented before Bajaj testified. "`Defendant's silence cannot possibly be used to impeach his credibility when he has yet to testify. Mention of defendant's pre-arrest silence at trial is to be used by the state as a "shield" to prevent the defendant from having the considered opportunity to construct a convenient, and unquestioned, exonerating story. Defendant's pre-arrest silence, in conformity with the rights theFifth Amendment to the United States Constitution is designed to protect, should not be used as a `sword' to provide the initial proof of defendant's guilt.'" State v. Leach, 150 Ohio App.3d 567, 2002-Ohio-6654, ¶ 37, quoting State v. Shea (July 17, 1985), 1st Dist. No. C-840806.
 {¶ 100} But Creeley's testimony was presented in rebuttal which, by definition, is used to impeach the defense witnesses' credibility. Bajaj testified in this case. Accordingly, the State could use his pre-arrest silence to challenge his credibility. Furthermore, the State did not refer to this aspect of Creeley's testimony during closing arguments. The prosecutor's line of inquiry on this issue did not violate Bajaj's Fifth and/or Fourteenth Amendment rights. Thus, the trial court did not plainly err by allowing the testimony and the prosecutor did not commit misconduct when asking the question.
 Pre-Arrest Silence as Substantive Evidence of Guilt {¶ 101} Prior to Leach, neither the Ohio nor United States Supreme Courts had addressed whether a defendant's pre-arrest, pre-Miranda
silence could be used as substantive evidence of guilt. But in Leach the court held that "[u]se of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." Id. at syllabus. It found that using pre-arrest, pre-Miranda silence as substantive evidence of guilt "undermines the very protections the Fifth Amendment was designed to provide. To hold otherwise would encourage improper police tactics, as officers would have reason to delay administering Miranda warnings so that they might use the defendant's pre-arrest silence to encourage the jury to infer guilt. * * * Use of pre-arrest silence in the state's case-in-chief would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence." (Citation omitted) Id. at ¶ 31. "We fail to see a reason to permit individuals to remain silent only when they have been specifically told by police of their right to do so." Id. at ¶ 35.
 {¶ 102} The police officer's testimony about his efforts to contact Bajaj would violate this prohibition if that testimony was about Bajaj's "pre-arrest silence" and if it was used "as substantive evidence of guilt." However, the officer's testimony does not meet either of these tests.
 {¶ 103} First, the testimony does not indicate that Bajaj chose to remain silent before talking to the police. Instead, the testimony demonstrates that the police were not able to contact Bajaj. During cross-examination, counsel was inquiring about the officer's investigation of Rodgers' allegations. The two had the following exchange:
 {¶ 104} "Q: Okay. You testified that you tried to contact — did you contact any other witnesses or persons that evening?
 {¶ 105} "A: Yes. I made two phone calls to Dr. Bajaj's residence and got no answer.
 {¶ 106} "* * *
 {¶ 107} "Q: [W]as it requested of you to bring certain documents with you to court this afternoon?
 {¶ 108} "A: Yes.
 {¶ 109} "Q: And what were those certain documents?
 {¶ 110} "A: You were requesting phone records.
 {¶ 111} "Q: Okay. Phone records with regards to what?
 {¶ 112} "A: To July 27, 28, or any time thereafter.
 {¶ 113} "Q: In other words, phone records trying to document what you're testifying to as attempts you made to contact Dr. Bajaj, is that correct?
 {¶ 114} "A: Yes.
 {¶ 115} "Q: Do those phone records exist?
 {¶ 116} "A: No they do not.
 {¶ 117} "Q: There is no proof that you attempted to contact Dr. Bajaj on July 27 or 28, is there?
 {¶ 118} "A: I did.
 {¶ 119} "Q: There is no other proof besides your testimony?
 {¶ 120} "A: True."
 {¶ 121} On redirect examination, the prosecutor asked about the officer's attempts to contact Bajaj.
 {¶ 122} "Q: Now, you also testified that you made — that you recall making at least two attempts to contact Dr. Bajaj?
 {¶ 123} "A: Yes.
 {¶ 124} "Q: Is that right?
 {¶ 125} "A: Yes.
 {¶ 126} "Q: When was that?
 {¶ 127} "A: That was —
 {¶ 128} "Q: If you know?
 {¶ 129} "A: That was the evening of the incident.
 {¶ 130} "Q: Okay. And did you get an answering machine?
 {¶ 131} "A: No. Got nothing.
 {¶ 132} "Q: Got no answer whatsoever?
 {¶ 133} "A: No.
 {¶ 134} "Q: Do you know if any other personnel from your office attempted to contact Dr. Bajaj?
 {¶ 135} "A: Yes. Officer Brophey. I left a standing order that the house be checked as often as he could on his turn. And I know that he was there upwards of five occasions in the following days.
 {¶ 136} "Q: Was he ever able to make contact with Dr. Bajaj?
 {¶ 137} "A: No.
 {¶ 138} "Q: All right. So Dr. Bajaj never gave you a statement?
 {¶ 139} "A: No. No."
 {¶ 140} This testimony does not indicate that Bajaj ever remained silent regarding the allegations against him. Rather, it shows that the police never were able to contact him in order to obtain a statement. Thus, this is not evidence of pre-arrest silence.
 {¶ 141} Second, the State did not use this testimony as substantive evidence of Bajaj's guilt. Defense counsel first elicited any testimony on this issue and the State did not refer to these issues again. The prosecutor did not mention this issue during his closing arguments as evidence of Bajaj's guilt.
 {¶ 142} The State did not use any evidence of Bajaj's pre-arrest silence as substantive evidence of his guilt. Accordingly, the trial court did not commit plain error by allowing this testimony and the prosecutor did not commit misconduct when making this line of inquiry. Bajaj's arguments to the contrary are meritless.
 Character Evidence {¶ 143} In his first and fifth assignments of error, Bajaj also contends the trial court erred when it allowed the State to introduce improper character evidence and that the prosecutor committed misconduct by asking prejudicial questions. Bajaj's argument refers to two questions the prosecutor asked him on cross-examination. First, Bajaj complains that the prosecutor improperly asked if anyone has told Bajaj that they did not believe the charges against him. Second, he contends the prosecutor should not have asked if he had been diagnosed with impulse control disorder.
 {¶ 144} During cross-examination, the State asked Bajaj, "No one came up to you and said, hey, you've got our support, we don't believe it or anything like that either, did they?" Bajaj responded that people came up to offer him support after the allegations were in the newspaper. The State then asked Bajaj if he had received psychological counseling recently. Bajaj responded that he had. The prosecutor then asked, "Have you been diagnosed with a condition called impulse control disorder?" Bajaj responded that he had not and that his diagnosis was depression. Bajaj's counsel did not object to either line of inquiry.
 {¶ 145} Bajaj argues that the State introduced improper character evidence, but he does not really object to the evidence produced at trial since he gave non-prejudicial answers to the questions asked. Rather, his complaint is that the prosecutor should never have asked the questions in the first place. Thus, his arguments are meritless to the extent that they challenge the admissibility of the evidence produced at trial.
 {¶ 146} Bajaj specifically contends the prosecutor committed misconduct because he did not have a good-faith basis to ask Bajaj whether he had been diagnosed with impulse control disorder. A cross-examiner may not ask a question if the examiner does not have a good-faith belief that a factual predicate for the question exists. Statev. Gillard (1988), 40 Ohio St.3d 226, 231. But defense counsel did not challenge the basis for the question at trial. Absent a challenge to the good-faith basis for the prosecutor's question, this court must presume that the prosecutor had one. Id. Thus, Bajaj's argument about the second line of inquiry is meritless.
 {¶ 147} The majority of Bajaj's challenge to these questions is a general attack on the impression these questions would leave in the jury's mind. But Bajaj did not challenge these questions at trial and answered them in a manner favorable to himself. Accordingly, Bajaj was not denied a fair trial merely because the prosecutor asked him these questions. Bajaj's arguments to the contrary are meritless.
 Sympathy for the Victims {¶ 148} In his first and fifth assignments of error, Bajaj also contends that the trial court erred by allowing the prosecutor to elicit testimony designed to show sympathy for the victim and that the prosecutor committed misconduct by eliciting this testimony, by commenting upon it during closing arguments, and by generally seeking the jury's sympathy for the victims and their families. Bajaj refers us to State v.McKinnon, a case pending before this court when he filed his brief, for another example of when this same prosecutor elicited similar testimony. In response, the State argues this evidence is highly relevant to establish that Rodgers was, in fact, the victim of a traumatic event.
 {¶ 149} After Bajaj filed his brief, we decided McKinnon. In State v.McKinnon, 7th Dist. No. 02 CO 36, 2004-Ohio-3359, we rejected a claim that there was any error when the investigating officer testified that, after twenty-one years in law enforcement, the victim in that case was "[p]robably one of the most traumatized victims I've dealt with." Id. at ¶ 150-154. In doing do, we relied on State v. Taylor (1996),78 Ohio St.3d 15. That case held that there is no prejudicial error when a prosecutor asks the jury to show sympathy for the victim. Id. at 27-28. "Evidence or comments about crime victims, including the impact of a crime on victims, do not offend the United States or Ohio Constitutions, and did not harm appellant." Id. at 28, citing Payne v.Tennessee (1991), 501 U.S. 808; State v. Hill, 75 Ohio St.3d 195, 199, 1996-Ohio-0222.
 {¶ 150} Bajaj's argument in this case is exactly that argued inMcKinnon. It is meritless for similar reasons.
 Joinder {¶ 151} In his fifth and sixth assignments of error, Bajaj claims his counsel was ineffective for seeking joinder of the two offenses and that the prosecutor committed misconduct by using the fact that Bajaj was charged with two separate offenses to encourage it to find him guilty of both offenses.
 {¶ 152} In response, the State contends that defense counsel made a strategic choice to join the cases which this court cannot question. It then argues that it did not commit misconduct. It contends that the State should be allowed to argue that the fact that there are two charges indicates Bajaj's guilt if Bajaj tries to use that fact to demonstrate his innocence.
 {¶ 153} The State is clearly correct about counsel's effectiveness. Counsel's trial strategy clearly was to discredit both Rodgers and Mott by implicating that the two conspired to make up their stories for financial gain. The only way to accomplish this strategy would be by joining the two trials. As stated above, we must refrain from secondguessing trial counsel's strategic decisions when reviewing an ineffective assistance of counsel claim. Carter at 558. Thus, we cannot conclude counsel was ineffective for requesting that the trial for the two offenses be joined.
 {¶ 154} Bajaj points to a statement the prosecutor made in his closing argument to argue that he committed misconduct. In closing arguments, the prosecutor concluded his argument with the following statements:
 {¶ 155} "Ladies and gentleman, this medical field, when a physician enters that field, they take what's called a Hippocratic Oath. I think we've all probably heard of that. And I pulled it up on the Internet and printed out a copy and read it over. And it ends like this, `May I always act so to preserve the finest traditions of my calling and may I long experience the joy of healing those who seek my help.'
 {¶ 156} "Christine Mott sought his help. Jamie Rodgers sought his help. What did he give them? Nothing. What did he make them? The objects of his own personal physical or sexual desires. Nothing more. He's an opportunist and nothing more. He saw an opportunity when Christine Mott came in there at the last appointment of that morning on July 27, and he took it and he thought he got away with it because she didn't tell right away. She actually walked out and looked apparently normal.
 {¶ 157} "And boy, that made him feel good. Boy, that gave him confidence. That empowered him. And he took a look at his schedule and who was there at the last appointment of the day? A good looking 22 year old girl. He said, hey, I got away with it with Christine, I'm going togo for it. That office is going to be empty. Here comes Jamie Rodgers.Life up your top, Jaime. Lifts up her top. Lift up the bra. She's lettingme do it. I'm getting away with it. Heck, I might as well go farther.
Pull your pants down Jaime."
 {¶ 158} Bajaj now complains of the italicized portion of the prosecutor's remarks.
 {¶ 159} The prosecutor is entitled to a certain degree of latitude in closing argument, and the trial court's has discretion to determine the propriety of a closing argument. State v. Benge, 75 Ohio St.3d 136, 141, 1996-Ohio-0227. But as the Tenth District has pointed out, "[o]ne of the dangers of joinder of cases is the opportunity for the jury to use the evidence from one case to corroborate the other." State v. Morales, 10th Dist. Nos. 03AP-319, 03AP-319, 2004-Ohio-3391, ¶ 34, citing State v.Wiles (1991), 59 Ohio St.3d 71, 77. Thus, the prosecutor did commit misconduct to the extent that he argued that the jury use the evidence from one offense to corroborate the other. Id.
 {¶ 160} Nevertheless, the prosecutor's remarks did not deny Bajaj a fair trial. In this case, there was no dispute either over Bajaj's identity. Instead, the jury was asked to decide whose version of events it believed, the victims' or Bajaj's. The prosecutor argued that the similarity between the incidents demonstrates that Bajaj was guilty of both offenses. But before the prosecutor made this argument, Bajaj argued that the similarities between the offenses demonstrated that he did not commit either of them. Thus, the State was merely responding to Bajaj's argument. Bajaj's arguments to the contrary are meritless.
 State's Exhibit 9 {¶ 161} In his first assignment of error, Bajaj argues the trial court erred by admitting State's Exhibit 9, a copy of the newspaper from September 5, 2001, which first publicized Rodgers' allegations against Bajaj. He contends the article contains inadmissible evidence, such as the potential sentence for sexual battery, the conditions of Bajaj's bond, and the fact that the case had been referred to the state medical board. The State contends that this information did not render that item inadmissible and that Bajaj has failed to demonstrate any prejudice.
 {¶ 162} It was not error for the trial court to admit this exhibit even though it said that the prosecutor would notify the state medical board. Although no one testified that Rodgers' allegations had been reported to the state medical board, Mott testified that she had filed a complaint with that body. And Creeley's testimony clarified that the state medical board was aware of the allegations. Thus, that portion of State Exhibit 9 was cumulative of other evidence already in the record.
 {¶ 163} On the other hand, it was error not to redact the portion of the exhibit stating the potential prison term Bajaj faced for sexual battery. As the Fifth District recently stated, the jury should not normally be told the potential sentences a criminal defendant faces for the charged offenses. State v. Hudson, 5th Dist. No. 02CAA12065, 2003-Ohio-7049, at ¶ 87-89. "[T]he subject of disposition is a matter for the court and not for the jury." State v. Rogers (1985),17 Ohio St.3d 174, 182. Since a jury does not have the option of recommending a particular sentence, it is not a matter for the jury to determine. State v. Smith, 80 Ohio St.3d 89, 116, 1997-Ohio-0355.
 {¶ 164} However, counsel did not object to this exhibit and this error does not rise to the level of plain error. Neither counsel directed the jury to pay special attention to this exhibit. Rather, it was introduced to show that September 5th was the day when Rodgers' allegations first became public. Furthermore, it is difficult to see how the potential length of the sentence would have affected whose version of events the jury chose to believe.
 {¶ 165} Finally, the trial court did not plainly err when it admitted this exhibit even though it contained the conditions of Bajaj's bail. The conditions of his bail were not excessive; he was required to post a $25,000 personal recognizance bond, to have no contact with the victims, and to surrender his passport. Admitting this evidence would affect the central question in this case, whether to believe the victims' version of events or Bajaj's.
 {¶ 166} In conclusion, the trial court did not plainly err when it admitted this exhibit into evidence without an objection. Bajaj's arguments to the contrary are meritless.
 Prosecutor's Remark on Witness Credibility {¶ 167} Most of Bajaj's claims of prosecutorial misconduct have already been addressed. But in his fifth assignment of error, Bajaj also claims that the prosecutor committed misconduct by questioning the honesty of the nurses who worked in the office with Bajaj. This argument is meritless.
 {¶ 168} A prosecutor cannot express his or her personal belief or opinion as to the credibility of a witness. State v. Smith (1984),14 Ohio St.3d 13, 14. But a prosecutor may relate the facts the jury is entitled to consider when evaluating a witness's credibility. State v.Watson (1991), 61 Ohio St.3d 1, 10.
 {¶ 169} In this case, the prosecutor did not express an opinion on whether the nurse who testified was credible. Rather, he made the following remark: "[W]hat did you really expect them to say, ladies and gentlemen? They're loyal employees; that's their livelihood out there." This remark was an attempt to show why the nurse was less credible, which is a proper argument. Bajaj's argument to the contrary is meritless.
 Ineffective Assistance of Counsel {¶ 170} Most of Bajaj's claims of ineffective assistance of counsel have also already been addressed. But he claims counsel was ineffective for three reasons not already addressed: 1) for not using all of Bajaj's peremptory challenges to prospective jurors, 2) for not cross-examining Rodgers on her inconsistent version of events, and 3) for not objecting to the testimony of Mott's husband. The State contends that defense counsel was not ineffective because the decision to use peremptory challenges cannot be the basis for a claim of ineffective assistance of counsel, because trial counsel has discretion when choosing how to cross-examine a witness, and because Mr. Mott's testimony was relevant.
 Peremptory Challenges {¶ 171} Bajaj contends that counsel was ineffective for failing to use two of his peremptory challenges. He points to five jurors which may have been biased against him and contends that counsel should have peremptorily dismissed two of these five prospective jurors. But as the State properly argues, this cannot be the basis for an ineffective assistance of counsel claim.
 {¶ 172} In State v. McNeill, 83 Ohio St.3d 438, 1998-Ohio-0293, the appellant contended that his trial counsel "wasted" two peremptories. The Ohio Supreme Court held that this was not ineffective assistance of counsel. "The use of peremptory challenges is a matter of strategy. Debatable trial tactics do not constitute ineffective assistance of counsel." Id. at 449; see also State v. Green, 7th Dist. No. 01 CA 54, 2003-Ohio-5442, ¶ 20. Bajaj's argument in this regard is meritless.
 Cross-Examination of Rodgers {¶ 173} Bajaj claims counsel was ineffective for not cross-examining Rodgers in the same manner as she was cross-examined during the first trial. Specifically, Rodgers claims counsel was ineffective for not impeaching Rodgers by using her original statement to police as a prior inconsistent statement. But Bajaj's argument is meritless.
 {¶ 174} "The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not constitute lack of effective assistance of counsel." State v. Dixon,101 Ohio St.3d 328, 2004-Ohio-1585, ¶ 54.
 {¶ 175} In this case, defense counsel chose to impeach Rodgers' testimony by using her prior inconsistent statements to the nurse at the hospital rather than her statement to police. The hospital nurse testified that Rodgers told her that Bajaj did not penetrate her with his fingers and defense counsel confronted Rodgers with this testimony on cross-examination. Then defense counsel focused on Rodgers' actions after the incident, comparing them to Mott's version of events. This once again focused the jury on defense counsel's central theme, Mott and Rodgers were making up their stories.
 {¶ 176} Using Rodgers' statement to the police may have helped show more minor inconsistencies, but these were minor. Defense counsel chose not to focus on these discrepancies and focused on others instead. Counsel performance in this regard was not deficient and Bajaj's argument to the contrary is meritless.
 Mr. Mott's Testimony {¶ 177} Bajaj claims there are multiple reasons why Mr. Mott should not have been allowed to testify. First, he claims that he should not have been allowed to testify about when Mott told him about the incident since she did not tell him about it until long after the fact. But this cannot be a reason for not objecting to Mr. Mott's testimony. Mott told Mr. Mott about the incident only three days after it occurred. Thus, a long period of time had not passed at this time. And any delay by Mott in telling her husband about the incident arguably helps the defense's claim that Mott manufactured the allegations. Thus, counsel was not ineffective for failing to object to this testimony.
 {¶ 178} Bajaj next claims that counsel was ineffective for failing to object to Mr. Mott's testimony about his anger and reaction to hearing about the allegations. But it is difficult to see how this testimony prejudiced Bajaj in any way. Mr. Mott's reaction to the allegations has nothing to do with whether Bajaj committed the offenses.
 {¶ 179} Finally, Bajaj contends that counsel was ineffective for not objecting to Mr. Mott's "damaging hearsay testimony" about his conversations with Bajaj's wife and Dr. Beatty's son. Mr. Mott testified that he was told of the incident three days after it occurred. That day, he called Dr. Beatty's house and spoke with his son. Mr. Mott told Dr. Beatty's son what happened. He then testified that Dr. Beatty's son answered, "My father would really want to know who you are and try to work this out." Mr. Mott said he hung up after refusing to tell Dr. Beatty's son his identity. Mr. Mott next called Bajaj's home and spoke with his wife. He testified that he told Mrs. Bajaj what happened. He then said, "[S]he was real apologetic and I told her it wasn't her fault, I just thought she should be aware of it."
 {¶ 180} These statements may be hearsay, although it is questionable whether they were introduced for the truth of the matter asserted, but they clearly were not damaging. The fact that Dr. Beatty's son wanted to know the name of Bajaj's accuser does not have anything to do with whether Bajaj committed the offenses in this case. Likewise, the fact that Bajaj's wife apologized for her husband's actions when an obviously angry man called her and accused her husband of improper advances does not raise an inference of Bajaj's guilt. Since Bajaj was not prejudiced by these statements, his counsel was not ineffective for failing to object to them.
 Cumulative Error {¶ 181} In his seventh assignment of error, Bajaj argues:
 {¶ 182} "The cumulative effect of errors deprived appellant of his right to a fair trial under both the Ohio and United States Constitutions, as confidence in the result being a just verdict was necessarily undermined."
 {¶ 183} Bajaj argues that even if the errors he has alleged herein are harmless individually, their cumulative effect has resulted in an unfair trial.
 {¶ 184} Separately harmless errors may violate a defendant's right to a fair trial when the errors are considered together. State v. Madrigal,87 Ohio St.3d 378, 397, 2000-Ohio-448. In order to find cumulative error, this court first must find that multiple errors were committed at trial. Id. at 398.
 {¶ 185} In this case, there are multiple instances of error. But the errors were all minor and had no real relation to the main issue at trial. Thus, the cumulative effect of these errors did not deny Bajaj his right to a fair trial.
 Sentencing {¶ 186} In his fourth assignment of error, Bajaj argues:
 {¶ 187} "The trial court erred in sentencing appellant."
 {¶ 188} Bajaj first argues that the trial court did not make the findings necessary to sentence him to more than the minimum sentence. When reviewing any sentence imposed for a felony, this court cannot reverse, vacate, or modify the sentence unless it clearly and convincingly finds either that the record does not support the sentencing court's findings or that the sentence is otherwise contrary to law. R.C.2953.08(G)(2). Furthermore, "when imposing a nonminimum sentence on a first offender, a trial court is required to make its statutorily sanctioned findings on the record at the sentencing hearing." State v.Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, ¶ 26.
 {¶ 189} The trial court may only impose a sentence beyond the minimum term when it specifically finds on the record that the shortest prison term would either demean the seriousness of the offender's conduct or would not adequately protect the public from future crime by the offender. R.C. 2929.14(B). The trial court is not required to give an explanation for its finding. Rather, the trial court "must note that it engaged in the analysis and that it varied from the minimum for at least one of the two sanctioned reasons." State v. Edmonson (1999),86 Ohio St.3d 324, 326.
 {¶ 190} In this case, the trial court found that a minimum sentence "would demean the seriousness of the criminal conduct that was here involved with regard to these two criminal acts." This finding complies with R.C. 2929.14(B) and is supported by the evidence. Accordingly, the trial court properly imposed a sentence greater than the minimum. Bajaj's argument to the contrary is meritless.
 {¶ 191} Bajaj also contends the trial court erred when it ordered that the sentences be served consecutively. However, since we have found that his conviction for sexual battery is not supported by sufficient evidence issues regarding the consecutive nature of his sentences are moot. Bajaj's fourth assignment of error is meritless.
 Conclusion {¶ 192} In conclusion, the vast majority of Bajaj's arguments are meritless. However, he correctly argues that his conviction for sexual battery is not supported by sufficient evidence. The fact that the defendant is the victim's doctor is insufficient to show that the doctor has coerced the victim to such an extent a person of ordinary resolution could not resist the sexual conduct. The only evidence of coercion in this case besides the fact that Bajaj is a doctor is that the examination table was up against the wall. This is insufficient to show that a person of ordinary resolution could not resist his advances. Accordingly, Bajaj's second assignment of error is meritorious and the remaining assignments of error are meritless. For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed in part and Bajaj's conviction for sexual battery is vacated.
Waite, P.J., concurs.
Vukovich, J., concurs.