OPINION
{¶ 1} Appellant, Anton D. Hamilton, Jr. ("Hamilton"), appeals the judgment entered by the Lake County Court of Common Pleas. Hamilton received a sentence of fifteen years to life for his conviction for murder in a retrial, following this court's reversal of his prior conviction.
 {¶ 2} The victim in this matter is Melvin Hamilton ("Melvin"), Hamilton's grandfather. On approximately Friday, May, 7, 1999, Hamilton arranged to stay with Melvin for a few days. Melvin agreed to allow Hamilton to stay at his residence until Monday. On a previous occasion, Hamilton lived with Melvin for several months.
 {¶ 3} On Monday, May, 10, 1999, Melvin's fiancée, Sandra Lawrence ("Lawrence"), returned to her house at 8:30 p.m. Melvin was there returning a truck he had borrowed from her son-in-law. Lawrence talked to Melvin for a few minutes. About 8:45 p.m., Melvin went to a local Perkins restaurant and ordered a takeout meal. Rory Weakland worked at the Perkins restaurant and testified that Melvin placed his order at 8:58 p.m. and he paid for the order at 9:14 p.m. She testified that Melvin waited in the restaurant while his order was being prepared.
 {¶ 4} Melvin did not go to work on Tuesday, May 11, 1999. When he did not show up for a birthday party that evening, Lawrence became concerned. Family members went to Melvin's house to check on him. Melvin's grey Lexus was missing from the driveway, where he usually parked it. The house was locked, but one family member had a key and unlocked the front door.
 {¶ 5} Melvin was found dead in his upstairs bedroom, lying on his bed, covered in blood. He was wearing his pajamas. His .38 caliber revolver was placed under his hand in an attempt to make the shooting look like a suicide. However, forensic evidence established that the gunshot wounds were not self-inflicted. The police were called, and several officers responded to the scene.
 {¶ 6} On the evening of May 11, 1999, Hamilton was at his mother's, Linda Brandon's ("Brandon"), house in Painesville. Anton Hamilton Sr. ("Anton Sr.") is Melvin's son and Hamilton's father. He called the house and spoke with Camile Hamilton ("Camile"), who is Hamilton's sister. Anton, Sr. told her that Melvin had been shot, but did not tell her he was dead. Camile went upstairs and told Brandon that Melvin had been shot. Hamilton was in the next bedroom during this conversation. Thereafter, Brandon went to Melvin's house, and Hamilton told Camile, "don't worry, grandpa's in heaven now." A few minutes later, Camile asked Hamilton how he could be lying in bed under the circumstances, and he replied "what am I supposed to do about it?"
 {¶ 7} Anton Sr. arrived at Brandon's house. He informed Hamilton that Melvin was dead, and Hamilton responded "what am I supposed to do, I got problems of my own?" and "I need to put a roof over my head." Anton Sr. told Hamilton to walk over to Melvin's house with him. On the way to the house, Anton Sr. was questioning Hamilton as to whether he had anything to do with Melvin's death.
 {¶ 8} Several family members and friends of Melvin's gathered in the lower level of his home. During this time, Hamilton sat alone on the couch in a nonchalant manner and did not speak to anyone.
 {¶ 9} Chief David R. Lutha of the Painesville Police Department testified for the state. At the time of the offense, Chief Lutha was a sergeant and was involved in the investigation of this matter. On the night Melvin's body was found, he responded to the scene. He was told that Hamilton may have been one of the last people to see Melvin alive, so he decided to interview him.
 {¶ 10} Chief Lutha asked Hamilton if he would go to the police station to give a statement, and Hamilton agreed to go. Hamilton rode to the station in the front seat of Chief Lutha's car. At the station, Hamilton gave a statement indicating he saw Melvin at 8:30 p.m. the night before when he stopped to get his clothes, that he did not hurt Melvin, and he did not know where Melvin's car was. After Hamilton gave this initial statement, Chief Lutha received a call from another officer at the scene. Based on the call, he determined there may be a discrepancy in the time Hamilton told him he last saw Melvin and what other witnesses had indicated. At that point, Chief Lutha determined Hamilton may be a possible suspect, so he read him the Miranda warnings before questioning him further. Hamilton waived his Miranda rights and gave a second statement. In the second statement, Hamilton described many of the same events that he did in the first statement. In addition, he stated that he knew Melvin had guns in the house, but the only one he had ever touched was a nine-millimeter handgun. At the police station, Hamilton's fingerprints were taken. Then, Hamilton was asked where he wanted to go and was driven to a nearby apartment complex.
 {¶ 11} The following day, Melvin's Lexus was found in an apartment complex parking lot. The police were not able to retrieve any fingerprints or other evidence from the vehicle.
 {¶ 12} The forensic testing revealed a latent print on the .38 caliber murder weapon matched appellant's fingerprint. With this knowledge, Sergeant Lutha called Anton, Sr. and asked him to bring Hamilton back to the police station. Sergeant Lutha had an arrest warrant for Hamilton, but that information was not conveyed to Hamilton. On May 18, 1999, Anton Sr. brought Hamilton to the police station. At the station, Hamilton was again read the Miranda warnings. He was told his fingerprint was found on the gun. In response, Hamilton shook his head and stated, "you might as well take me over." Hamilton was arrested and taken into custody.
 {¶ 13} At trial, Hamilton testified on his own behalf. His version of the events on the night Melvin died was as follows. He went to Melvin's house about 8:30 p.m. to pick up some of his clothes. Melvin answered the door and let him in. Then, Melvin sat on the couch and watched television. Hamilton retrieved a duffel bag with his clothes and left the residence. On his way out, Hamilton locked the front door, as Melvin requested him to do. After leaving Melvin's house, he walked to Mary Enoch's apartment. She was not home, so he left after waiting a few minutes. Then, he walked to his cousin's, Arthur Cook's, residence, and stayed there the remainder of the night. He testified that he told Chief Lutha that he did not remember handling any of Melvin's other guns, not that he did not handle them. Finally, he testified that he could have handled the .38 caliber handgun on a prior occasion when he lived with Melvin.
 {¶ 14} Hamilton was charged with one count of murder, in violation of R.C. 2903.02, with a firearm specification. He pled not guilty to the charge.
 {¶ 15} In 1999, a jury trial was held, and the jury returned a guilty verdict on the murder charge. Hamilton was sentenced to a prison term of fifteen years to life. Hamilton appealed that judgment to this court. This court reversed the judgment of the trial court and remanded the matter for a new trial based on improper evidentiary rulings.[1]
 {¶ 16} After the case was remanded, Hamilton filed a pro se motion for a change of venue, pursuant to Crim. R. 18. The trial court denied this motion.
 {¶ 17} A new jury trial was held. At the close of the state's case-in-chief, defense counsel moved for acquittal pursuant to Crim. R. 29. The trial court denied this motion. At the close of all evidence, defense counsel renewed the motion for acquittal. Again, the trial court denied the motion. The jury returned a guilty verdict. Hamilton was sentenced to a term of fifteen years to life on the murder conviction. In addition, he received a three-year term for the firearm specification, which was to be served prior to and consecutive with the underlying prison term.
 {¶ 18} After the trial court issued its judgment entry of sentence, Hamilton filed a motion for a new trial pursuant to Crim. R. 33. Prior to the trial court ruling on Hamilton's motion, he filed a timely notice of appeal with this court. The trial court denied his motion for a new trial. Thereafter, this court issued a judgment entry indicating Hamilton's appeal would be considered a premature appeal as of the date the trial court overruled his motion for a new trial.
 {¶ 19} Hamilton raises six assignments of error on appeal. His first assignment of error is:
 {¶ 20} "The trial court erred to the prejudice of the defendant-appellant when it failed to remove a prospective juror for cause, thus depriving the defendant-appellant of his right to a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 1, Article 10 of the Ohio Constitution."
 {¶ 21} "A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion."[2]
The term "abuse of discretion" implies that the court's decision was arbitrary, unreasonable, or unconscionable.[3]
 {¶ 22} Hamilton claims the trial court erred by not excusing Prospective Juror King for cause. King indicated that he had read a couple of newspaper articles about this case. He knew Hamilton had been convicted and believed there must have been a problem necessitating a retrial. King also indicated that he remembered that Hamilton lived with his grandfather. Defense counsel asked King if his knowledge of Hamilton's prior conviction would "have some kind of effect in the back of your mind during the course of this case?" King responded "I believe so, I mean, I'm not going to tell you that it wouldn't." However, King also replied that he would decide the case based on the evidence presented, not what he had read in the newspaper. When asked by the trial court, King stated that his prior knowledge would not affect his thought process in this case. Finally, he stated that he was of the opinion that this case was starting over and that Hamilton was presumed innocent until proven guilty.
 {¶ 23} The trial court declined to excuse King for cause. Hamilton used a peremptory challenge to excuse King. Moreover, Hamilton used the remainder of his allotted peremptory challenges to excuse other potential jurors.
 {¶ 24} In this matter, the trial court heard King's statements that he would be impartial and rely on the evidence presented in trial. Thus, the trial court was in a position to specifically assess King's credibility and, ultimately, his ability to be impartial.[4] The trial court did not abuse its discretion by failing to dismiss King for cause.
 {¶ 25} However, even if we were to find error in the trial court's decision regarding King, Hamilton's argument would still fail. In order to assert a successful constitutional violation regarding an impartial jury, the defendant must have used all of his peremptory challenges and, further, demonstrate that one of the jurors actually seated lacked impartiality.[5] This is because reviewing courts must determine "`"whether the composition of the jury panel as a whole could possibly have been affected by the trial court's error."'"[6]
 {¶ 26} On appeal, Hamilton has not alleged or demonstrated that a seated juror was biased. Therefore, he cannot succeed on his ultimate claim regarding the trial court's failure to excuse King for cause.
 {¶ 27} Hamilton's first assignment of error is without merit.
 {¶ 28} Hamilton's second assignment of error is:
 {¶ 29} "The trial court erred to the prejudice of the defendant-appellant when it denied his motion for change of venue, thus resulting in a violation of his right to a fair and impartial jury as guaranteed by the United States and Ohio Constitutions."
 {¶ 30} Hamilton filed a handwritten, pro se motion for change of venue pursuant to Crim. R. 18(B), which provides, in part:
 {¶ 31} "Upon the motion of any party or upon its own motion the court may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending."
 {¶ 32} The decision to grant a motion for change of venue is left to the discretion of the trial court.[7] Appellant attached copies of two newspaper articles from The News Herald, a local paper published in Willoughby, Ohio. One of the articles was a general article concerning the number of plea bargains being entered in criminal cases. The article quoted Lake County Prosecutor Charles E. Coulson, who offered several opinions as to why defendants choose to enter a plea agreement rather than going to trial. One explanation Coulson provided was that sometimes a guilty individual will "take their chances" by going to trial in order to "confuse the jury." This article does not mention Hamilton's name.
 {¶ 33} The second article Hamilton attached to his motion was an article regarding this court's reversal of his first conviction. The article contained a brief history of Hamilton's case. The majority of the article focused on recent court proceedings, such as the trial court's decision on his motion to reduce bond and Hamilton's decision to withdraw his motion to proceed pro se.
 {¶ 34} The Supreme Court of Ohio held that the trial court in Statev. Lundgren did not abuse its discretion in denying a motion to change venue.[8] In Lundgren, there were two hundred twenty-seven Lundgren-related articles in The News Herald and one hundred twenty-three articles in the Cleveland Plain Dealer.[9]
 {¶ 35} Compared to Lundgren, the publicity in this matter was relatively minimal. Hamilton only directed the court's attention to two newspaper articles, one of which does not mention his name or his case. Moreover, neither of these articles was so prejudicial to suggest that an impartial trial could not be held in Lake County. Thus, we cannot say the trial court abused its discretion by overruling Hamilton's motion for change of venue.
 {¶ 36} Hamilton's second assignment of error is without merit.
 {¶ 37} Hamilton's third assignment of error is:
 {¶ 38} "The trial court erred to the prejudice of the defendant-appellant by failing to grant his motion for mistrial based upon the misconduct of three of the state's witnesses, thus violating his right to due process and a fair trial as guaranteed by the Sixth andFourteenth Amendments to the United States Constitution and Sections 5
and 10, Article I of the Ohio Constitution."
 {¶ 39} A trial court's decision on whether to grant a mistrial lies within its discretion.[10] In addition, a reviewing court will not disturb a trial court's decision regarding a motion for a mistrial absent an abuse of discretion.[11]
 {¶ 40} Hamilton claims three of the state's witnesses made improper comments during their testimony.
 {¶ 41} On two occasions, a state's witness made a reference to appellant's first trial. Rory Weakland testified for the state. In May 1999, she worked at the Perkins restaurant in Painesville. She waited on Melvin on May 10, 1999, when he placed his takeout order. During cross-examination, the following colloquy occurred:
 {¶ 42} "Q. When you were — were you ever approached by investigators? When were you first approached by anyone asking about that night?
 {¶ 43} "A. When I a [sic] got a call about the first trial and to ask if I'd look at the receipt."
 {¶ 44} Sergeant Gerald Lynch was one of the police officers involved in this case. The following questioning occurred on cross-examination:
 {¶ 45} "Q. Sergeant, good afternoon. Now, if my math is correct, back in 1999 you had been a member of the Painesville Police Department for eight years; is that correct?
 {¶ 46} "A. Possibly at the time of trial, yeah."
 {¶ 47} We note that Hamilton did not object to either of these comments at trial, thus, he has waived all but plain error.[12] Plain error exists only where the results of the trial would have been different without the error.[13] In addition to not objecting to these comments, defense counsel did not move for a mistrial based upon them.
 {¶ 48} The Supreme Court of Ohio has addressed the implications of commenting on a prior trial and held:
 {¶ 49} "R.C. 2945.82, which provides, `When a new trial is * * * awarded on appeal, the accused shall stand for trial upon the indictment or information as though there had been no previous trial thereof.' * * *
 {¶ 50} "We do not read this as meaning that a previous trial can never be mentioned in any way during a retrial of the same cause. Rather, we think it means simply that there is no requirement for a new indictment or information when a case is remanded for retrial."[14]
 {¶ 51} The Seventh Appellate District recently issued an opinion favorably citing the Second Appellate District for the proposition that references to a "`first trial'" do not necessarily violate a defendant's right to a fair trial.[15] In addition, the Seventh District noted, "[i]t would be much more prejudicial for a party to refer to the outcome of the prior court proceeding, especially if that outcome was adverse to either party."[16] We agree with both of these propositions.
 {¶ 52} In the case sub judice, both of the references to the first trial were made during cross-examination. In addition, both statements can be described as inadvertent, as they were given in response to questions regarding collateral, background information. Finally, neither comment referred to the results of the first trial.
 {¶ 53} Hamilton has not demonstrated error in relation to these instances where the first trial was mentioned.
 {¶ 54} Hamilton also claims that a mistrial should have been granted during the testimony of Jameson Jeffries. On cross-examination of Jeffries, the following exchange occurred:
 {¶ 55} "Q. And part of the agreement also would be that you would have a recommended sentence of six months?
 {¶ 56} "A. Yes.
 {¶ 57} "Q. So, we are going from four years to six months?
 {¶ 58} "A. Yeah.
 {¶ 59} "Q. And, of course, that sounded good to you, right?
 {¶ 60} "A. Yeah.
 {¶ 61} "Q. So, you enter into an agreement, right?
 {¶ 62} "A. Yeah.
 {¶ 63} "Q. Signed by yourself, your counsel, Vincent Culotta, Mark Bartolotta, correct?
 {¶ 64} "A. Yeah.
 {¶ 65} "Q. Saying that in exchange for what they were going to do for you, you were going to make a statement against Anton Hamilton, and you were going to testify against Anton Hamilton; is that correct?
 {¶ 66} "A. Yeah.
 {¶ 67} "Q. And, of course, you jumped all over it?
 {¶ 68} "A. Not at first, no.
 {¶ 69} "Q. You had to think it over for a while?
 {¶ 70} "A. Yeah.
 {¶ 71} "Q. Well, eventually you decide to sign it?
 {¶ 72} "A. Eventually, yeah.
 {¶ 73} "Q. You made a statement?
 {¶ 74} "A. After taking a lie detector test."
 {¶ 75} Following this comment, defense counsel objected and moved for a mistrial. The trial court denied Hamilton's motion for a mistrial. In response, defense counsel moved to strike the final comment. The trial court granted the motion to strike and instructed the jury that they were to disregard the last comment.
 {¶ 76} Like the previous comments, this comment was elicited during cross-examination and appears to have been given inadvertently. In addition, although there was an inference presented, Jeffries did not comment on the results of the lie detector test.
 {¶ 77} In State v. Jones, a witness was asked whether he had taken a lie detector test. Despite an objection, the witness responded in the affirmative.[17] The trial court instructed the jury to disregard the question; however, it denied the defendant's motion for a mistrial.[18]
The Supreme Court of Ohio found no error in the trial court's decision to issue a curative instruction and deny the motion for a mistrial. The Supreme Court of Ohio noted that "[t]he jury is presumed to have followed the court's instructions."[19]
 {¶ 78} As was the situation in State v. Jones, in the case at bar, the trial court struck the answer given by Jeffries regarding the lie detector test. Also, the trial court gave a curative instruction to the jury that they were not to consider the response. However, in this case, the response occurred during cross-examination by defense counsel, while the questioning in State v. Jones occurred during redirect examination by the prosecution.[20]
 {¶ 79} Since the reference to the lie detector test was inadvertent, the answer was elicited during cross-examination, no results of the test were provided, and the trial court gave a curative instruction to the jury, we cannot say the trial court abused its discretion by denying Hamilton's motion for a mistrial.
 {¶ 80} Hamilton's third assignment of error is without merit.
 {¶ 81} Hamilton's fourth and fifth assignments of error concern the weight and sufficiency of the evidence provided at trial. We will address these assigned errors out of order. Hamilton's fifth assignment of error is:
 {¶ 82} "The trial court erred to the prejudice of the defendant-appellant in denying his motion for acquittal made pursuant to Crim. R. 29(A)."
 {¶ 83} A trial court shall grant a motion for acquittal when there is insufficient evidence to sustain a conviction.[21] When determining whether there is sufficient evidence presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[22]
 {¶ 84} Hamilton was charged with murder, in violation of R.C. 2903.02, which provides, in pertinent part:
 {¶ 85} "(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy."
 {¶ 86} In this case, there was little direct evidence establishing that Hamilton murdered Melvin. There were no witnesses to the crime. There were no photographs or videotape of the killing. Finally, there was no direct admission from Hamilton. However, the state presented significant circumstantial evidence linking Hamilton to the crime. The Supreme Court of Ohio has held that "`circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof.'"[23]
 {¶ 87} In 1999, Dr. Heather Raff was employed by the Lake County Coroner's Office and performed the autopsy on Melvin. She testified the cause of death was three gunshot wounds. In addition, in her opinion, the gunshot wounds were not self-inflicted.
 {¶ 88} Hamilton's fingerprint was found on the murder weapon. This was evidence before the jury that Hamilton touched the murder weapon at some time. In his police statements, Hamilton only admitted touching Melvin's nine-millimeter gun. Therefore, there is the inference that he touched the other gun when using it to shoot Melvin.
 {¶ 89} Hamilton's police statement is also directly contradicted by Lawrence's trial testimony. Lawrence testified that Melvin was at her house from 8:30 to 8:45 p.m. on May 10, 1999. Also, she testified that Melvin was returning a truck, which he had borrowed to clean out his brother's house. Rory Weakland testified that Melvin placed his takeout order at 8:58 p.m. Taken together, this testimony disproves Hamilton's assertion that he saw his grandfather at 8:30 p.m.
 {¶ 90} The doors of Melvin's house were locked when the family members arrived on May 11, 1999. None of the windows or doors were broken. Inside the house, there was no evidence of a struggle. These facts suggest Melvin was killed by someone he knew.
 {¶ 91} Hamilton was in the location of Melvin's house on the night Melvin was murdered. Jonathan King, a neighborhood friend of Hamilton's, testified that he encountered Hamilton walking on a street near Melvin's residence about 10:45 p.m. on May 10, 1999. Jameson Jeffries was another friend of Hamilton's. On May 10, 1999, Jeffries noticed Hamilton walking in the vicinity of Melvin's house. Jeffries gave Hamilton a ride around the block. After talking to him for a while, Jeffries dropped Hamilton off near Jonathan King, whom Jeffries also knew. The testimony of these witnesses placed Hamilton near Melvin's house, close to the time the coroner estimated Melvin was killed.
 {¶ 92} The state presented evidence that Hamilton had a motive for the crime. Hamilton had been staying at Melvin's house, but the arrangement had ended the day Melvin died, Monday, May 10, 1999. Jonathan King testified that he spoke to Hamilton a few weeks prior to Melvin's death, and Hamilton was upset about being "put out." According to King, Hamilton told him that his family members would pay for putting him out. Also, on the night Melvin's body was found, Hamilton made several comments regarding the fact that he needed to find a place to stay and that he had "problems of his own."
 {¶ 93} Hamilton made several statements to various individuals, which indicate that he was the individual who killed Melvin. First, prior to being informed that Melvin had died, Hamilton informed his sister that Melvin was in heaven. This statement suggests Hamilton already knew Melvin was dead.
 {¶ 94} Jeffries testified that Hamilton approached him when they were both in jail and asked Jeffries to arrange an alibi for him. When Jeffries told him he was unable to arrange an alibi witness, Hamilton told him he would kill somebody else because of all the things he did for people. When Jeffries told Hamilton he did not think he was involved in the incident, Hamilton responded, "I fucked up. I was fucked up." In addition, Jeffries testified that Hamilton told him he should use an insanity defense and that he should have gone to Mexico when he had the chance. All of these statements suggest Hamilton was involved in Melvin's death.
 {¶ 95} The state presented sufficient evidence showing Hamilton had a motive for killing Melvin, that Hamilton's fingerprint was on the murder weapon, that he was in the area on the night of the crime, and that he made several statements suggesting he was involved in the murder. Based upon this evidence, when it is viewed in a light most favorable to the prosecution, a reasonable person could find Hamilton guilty of murder beyond a reasonable doubt. Therefore, the trial court did not err by denying Hamilton's motion for acquittal.
 {¶ 96} Hamilton's fifth assignment of error is without merit.
 {¶ 97} Hamilton's fourth assignment of error is:
 {¶ 98} "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."
 {¶ 99} In determining whether a verdict is against the manifest weight of the evidence, the Supreme Court of Ohio has adopted the following language as a guide:
 {¶ 100} "`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'"[24]
 {¶ 101} We note the weight to be given to the evidence and the credibility of witnesses are primarily matters for the jury to decide.[25]
 {¶ 102} As we have previously determined, the state presented sufficient evidence to sustain Hamilton's conviction. We will now determine whether the jury erred in weighing the evidence.
 {¶ 103} Hamilton testified as to his whereabouts on the night in question. However, some of Hamilton's testimony was directly contrary to evidence provided by other witnesses. One specific instance was that Lawrence testified Melvin was at her house until 8:45 p.m. on May 10, 1999. However, defense counsel cross-examined Lawrence about why she told the police that Melvin left her house at 8:30 p.m. Hamilton argues that Melvin had enough time to leave Lawrence's house at 8:30 p.m., go home and encounter Hamilton, then leave for the Perkins restaurant. It was the jury's job to weigh this evidence and determine whether it was credible. Further, even if the jury believed Melvin did encounter Hamilton between 8:30 and 9:00 p.m., such a conclusion would not necessarily be inconsistent with a guilty verdict. Dr. Raff estimated Melvin died about four hours after he had eaten. Therefore, the jury could have concluded that Hamilton had seen Melvin at 8:30 p.m. and returned to the house later in the evening and committed the crime.
 {¶ 104} Hamilton notes that Jonathan King and Jameson Jeffries were both given reduced sentences in exchange for their testimony in this case. The jury was informed about the plea agreements and reduced sentences. The fact that the individuals received reduced sentences in exchange for their testimony is a factor going to their credibility, but it does not, per se, make their testimony incredible. As with any witness, the jury was in the best position to observe their demeanor on the witness' stand to assess their credibility.
 {¶ 105} Hamilton offered an explanation as to how his fingerprint could have appeared on the murder weapon. He testified that he told Chief Lutha that he did not remember touching any of Melvin's guns other than the nine-millimeter handgun. However, his statement does not contain the word "remember." There was evidence before the jury that Hamilton touched the murder weapon. Apparently, the jury decided not to believe Hamilton's testimony that he could have handled the .38 caliber gun prior to the murder to account for his fingerprint being found on the gun.
 {¶ 106} Hamilton testified that his statement to Camile that Melvin was in heaven was based on an assumption, because he knew that Melvin had been shot, he had been missing all day, and no one called them to go to the hospital. The jury may not have believed Hamilton's explanation for this statement. Instead, they could have concluded that Hamilton believed his sister had been told that Melvin died and that Hamilton's knowledge was based on his first-hand knowledge that Melvin was dead.
 {¶ 107} Again, there were several instances of conflicting testimony presented in this trial. However, after reviewing all of the evidence presented, we cannot say the jury lost its way or created a manifest miscarriage of justice by finding Hamilton guilty of murder.
 {¶ 108} Hamilton's fourth assignment of error is without merit.
 {¶ 109} Hamilton's sixth assignment of error is:
 {¶ 110} "The trial court erred to the prejudice of the defendant-appellant when it overruled his motion for new trial."
 {¶ 111} Following his conviction, Hamilton filed a motion for a new trial. "A reviewing court will not disturb a trial court's decision granting or denying a Crim. R. 33 motion for new trial absent an abuse of discretion."[26]
 {¶ 112} The basis for Hamilton's motion was the assertion that one of the jurors, Mr. Chick, was pressured into returning a guilty verdict. The jury began deliberating at 1:00 p.m. on Friday, January 30, 2004. On Tuesday, February 3, 2004, the trial court received the following note from the jury, "`[w]e cannot come to a verdict, despite our best efforts. Please advise.'" The trial court noted this was the second time the jury indicated it could not reach a verdict. Thereafter, the trial court instructed the jury to attempt to reach a verdict by reexamining their individual positions.
 {¶ 113} In Ohio, the instruction given by the trial court has come to be known as a Howard charge.[27] The Supreme Court of Ohio has held, "[i]n several cases, we have upheld the use of a Howard charge, specifically finding that such an instruction is not coercive, and is `"intended for a jury that believes it is deadlocked, so as to challenge them to try one last time to reach a consensus."'"[28]
 {¶ 114} Defense counsel objected to the issuance of a Howard charge in this matter. However, the trial court overruled defense counsel's objection and gave the following instruction to the jury:
 {¶ 115} "I am sure if it's not already been said I will say it any way, all of us here appreciate the efforts you are all making in the deliberation process. I will instruct you as follows, however, in a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not the mere acquiescence in the conclusions of other jurors, each question submitted to you should be examined with proper regard and deference to the opinions of others. It is desirable that the case be decided. Your [sic] are selected in the same manner and from the same source as any future Jury would be. There is no reason to believe the case will ever be submitted to a Jury more capable, more impartially, or more intelligent than this Jury. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's opinions with a disposition to be persuaded. Do not hesitate to reexamine you views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that an unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by other, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.
 {¶ 116} "At this time I instruct you to return to the Jury room and continue with your deliberations."
 {¶ 117} The jury returned to the jury room and continued deliberating. The following day, the jury indicated it had reached a verdict. The jury returned a guilty verdict. All twelve members of the jury, including Mr. Chick, signed the verdict forms. In addition, the jury was polled, which resulted in the following dialogue:
 {¶ 118} "The Court: Mr. Chick, is that your verdict?
 {¶ 119} "Mr. Chick: Yes."
 {¶ 120} After the judgment entry of sentence was entered, Hamilton filed his motion for a new trial. He attached an affidavit from Juror Chick, wherein he states he thought he had no choice but to return a guilty verdict after the court gave the Howard instruction.
 {¶ 121} A juror is permitted to testify in certain limited circumstances regarding a jury verdict.[29] This principle is set forth in Evid. R. 606(B), which provides:
 {¶ 122} "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes."
 {¶ 123} As the trial court noted, the Supreme Court of Ohio has held that "[o]nce a poll of the jurors has been completed and all have assented to the verdict, a juror may not thereafter rescind or modify his or her vote."[30] Further, since the Supreme Court of Ohio has held that a Howard charge is not coercive, we hold that it cannot be the basis for a subsequent Evid. R. 606(B) allegation of juror duress or compulsion.
 {¶ 124} The trial court did not abuse its discretion by denying Hamilton's motion for a new trial.
 {¶ 125} Hamilton's sixth assignment of error is without merit.
 {¶ 126} The judgment of the trial court is affirmed.
Ford, P.J., O'Toole, J., concur.
[1] State v. Hamilton (Apr. 12, 2002), 11th Dist. No. 2000-L-003, 2002 Ohio App. LEXIS 1659.
[2] State v. Williams (1997), 79 Ohio St.3d 1, 8, citing State v.Wilson (1972), 29 Ohio St.2d 203, 211.
[3] State v. Adams (1980), 62 Ohio St.2d 151, 157-158.
[4] See State v. Murphy (2001), 91 Ohio St.3d 516, 526.
[5] State v. Broom (1988), 40 Ohio St.3d 277, 288.
[6] (Emphasis in original.) Id. at 287, quoting Gray v. Mississippi
(1987), 481 U.S. 648, 665, quoting Moore v. Estelle (C.A.5, 1982),670 F.2d 56, 58.
[7] State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 85, citing State v. Lundgren (1995), 73 Ohio St.3d 474, 479.
[8] State v. Lundgren, 73 Ohio St.3d at 478.
[9] Id. at 478.
[10] State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190, at ¶ 92, citing State v. Glover (1988), 35 Ohio St.3d 18, 19, and State v. Brown,100 Ohio St.3d 51, 2003-Ohio-5059, at ¶ 42.
[11] Id.
[12] See, e.g., State v. Green (2000), 90 Ohio St.3d 352, 373, citingState v. Wade (1978), 53 Ohio St.3d 182, paragraph one of the syllabus.
[13] State v. Issa (2001), 93 Ohio St.3d 49, 56, citing State v.Moreland (1990), 50 Ohio St.3d 58, 62.
[14] State v. Keenan (1998), 81 Ohio St.3d 133, 150.
[15] State v. Bajaj, 7th Dist. No. 03 CO 16, 2005-Ohio-2931, at ¶ 90, citing State v. Hopfer (1996), 112 Ohio App.3d 521, 540.
[16] Id. at ¶ 92, citing Jones v. Keller (1996), 9 Ohio App.2d 210,212.
[17] State v. Jones (2001), 91 Ohio St.3d 335, 344.
[18] Id.
[19] Id., citing State v. Raglin (1998), 83 Ohio St.3d 253, 264.
[20] State v. Jones, 90 Ohio St.3d at 344.
[21] Crim. R. 29(A).
[22] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307.
[23] State v. Biros (1997), 78 Ohio St.3d 426, 447, quoting State v.Jenks, 61 Ohio St.3d 259, paragraph one of the syllabus.
[24] (Citations omitted.) State v. Thompkins (1997), 78 Ohio St.3d 380,387.
[25] State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
[26] State v. LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128, at ¶ 82, citing State v. Schiebel (1990), 55 Ohio St.3d 71, 76.
[27] State v. Gapen, 104 Ohio St.3d 358, ¶ 120, citing State v.Howard (1989), 42 Ohio St.3d 18, paragraph two of the syllabus.
[28] (Citations omitted.) State v. Gapen, at ¶ 128.
[29] See State v. Hessler (2000), 90 Ohio St.3d 108, 123.
[30] State v. Williams, 99 Ohio St.3d 493, 2003-Ohio-4396, paragraph one of the syllabus.